[No. E034051. Fourth Dist., Div. Two. Oct. 13, 2004.]

COSO ENERGY DEVELOPERS et al., Plaintiffs and Appellants, v. COUNTY OF INYO, Defendant and Respondent.

1514

COUNSEL

McDonough Holland & Allen, Robert R. Rubin and Ann Taylor Schwing for Plaintiffs and Appellants.

Paul N. Bruce, County Counsel, and Allen R. Berrey, Assistant County Counsel, for Defendant and Respondent.

Bill Lockyer, Attorney General, William Brieger, Acting Chief Assistant Attorney General, J. Matthew Rodriguez, Assistant Attorney General, Alan V. Hager and Michael L. Crow, Deputy Attorneys General, for State Lands Commission and California Board of Equalization as Amici Curiae on behalf of Defendant and Respondent.

OPINION

KING, J.—

## INTRODUCTION

■ Coso Energy Developers, Coso Finance Partners, and Coso Power Developers (the Coso entities) appeal from a judgment denying their claims for refunds of property taxes paid to the County of Inyo (Inyo). The Coso entities contend that Statutes 1891, chapter 181, section 1, page 262 (1891 Statute) precludes Inyo from taxing a portion of their geothermal energy operations located on land within the China Lake Naval Weapons Center (NWC). We disagree and affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The essential facts were stipulated to by the parties or are undisputed. The Coso entities operate geothermal energy projects located within the NWC in Inyo County. The Coso entities operate their projects pursuant to certain contracts and leases with the United States Navy. Under these agreements, the Coso entities own the right to explore, develop, and take geothermal steam and related minerals from a portion of the land. They also own power plants, facilities, equipment, and personalty related to the projects.

The land on which the Coso entities operate their projects was ceded to the United States by Mexico pursuant to the Treaty of Guadalupe Hidalgo in 1848. (Feb. 2, 1848, 9 Stat. 922.) Some portions of this land have been continuously owned by the United States since that time, while other portions were conveyed by the United States to private parties or to the State of California in or after 1891. The Coso entities do not dispute that Inyo may tax its operations situated on land that has not been continuously owned by the United States. Their claims are limited to the taxation of their operations on land that has been continuously owned by the United States since 1848.

Inyo levied taxes against the Coso entities based upon the value of their possessory interests in the projects as determined by the Inyo County Assessor. In 2000 and 2001, the Coso entities filed refund claims with Inyo for taxes paid for the years 1996 through 2000,[1] which Inyo denied. The Coso entities then commenced this action to recover the disputed amounts. They asserted that the land on which their improvements are located has been continuously owned by the United States, and that, by way of the 1891 Statute, California ceded exclusive jurisdiction to the United States. The Coso entities argue that because exclusive jurisdiction was ceded to the federal government, Inyo could not tax their possessory interests.

Inyo denied the Coso entities' claims and argued that "the 1891 Statute is meant to include land which has been or may be ceded by the State of California to the United States and does not include the cession from Mexico to the United States in 1848." Inyo further asserted affirmative defenses, including waiver, equitable estoppel, laches, and the failure to exhaust administrative remedies. The State of California, acting by and through the State Lands Commission, appeared at trial as amicus curiae in support of Inyo.[2]

The matter was tried and the court found in favor of Inyo. The court explained: "To hold that [the 1891 Statute] was intended to cede exclusive jurisdiction to the federal government over all public domain lands then within California because said lands had been ceded to the United States by the Treaty of Guadalupe Hidalgo results in an absurdity of monumental magnitude." The court also concluded that "the presumption of acceptance [of jurisdiction by the United States] has been rebutted and that . . . jurisdiction has not been accepted." The court did not rule on the merits of Inyo's defenses. Judgment was entered for Inyo and the Coso entities appealed.

---

[1] According to the Coso entities, these are the only years within the limitations period for bringing tax refund actions.

[2] The State Lands Commission and the California Board of Equalization applied to this court, and we granted permission, to file a brief as amici curiae on appeal.

## ANALYSIS

■ The parties agree that if the State of California ceded exclusive jurisdiction over the subject land, and the United States accepted such jurisdiction, Inyo cannot tax the Coso entities' interests on such land. The primary issues before us are whether the 1891 Statute was intended to constitute a cession of exclusive jurisdiction over the subject land and, if so, whether the United States accepted such jurisdiction. Because the meaning and construction of a statute is a pure question of law, we review the statutory interpretation issue de novo and make our determination independently of the trial court's construction. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]; *Ventura County Dept. of Child Support Services v. Brown* (2004) 117 Cal.App.4th 144, 149–150 [11 Cal.Rptr.3d 489].) **(3)** To the extent the trial court's conclusion that the United States did not accept jurisdiction was based upon factual findings, we will accept such findings if they are supported by substantial evidence. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

A. *Background*

■ The State of California or its instrumentalities may not tax property interests held by the United States. (See *S. R. A. v. Minnesota* (1946) 327 U.S. 558, 561 [90 L.Ed. 851, 66 S.Ct. 749]; *West v. Oklahoma Tax Commission* (1948) 334 U.S. 717, 723–724 [92 L.Ed. 1676, 68 S.Ct. 1223]; *People v. Shearer* (1866) 30 Cal. 645, 655; Act for Admission of State of Cal. into Union, 9 Stat. 452, § 3.) Whether the state or a county can impose a tax upon private parties based upon property interests situated on land owned by the United States depends upon the nature of the federal government's jurisdiction over such property.

■ Where the United States has "exclusive jurisdiction" over an area within a state, "no other legislative power than that of Congress can be exercised over" such area. (*Fort Leavenworth R. R. Co. v. Lowe* (1885) 114 U.S. 525, 537–538 [29 L.Ed. 264, 5 S.Ct. 995] (*Fort Leavenworth*).) The state is barred "from exercising any legislative authority, including its taxing and police power, in relation to the property and activities of individuals and corporations within the territory." (*Silas Mason Co. v. Tax Comm. of Washington* (1937) 302 U.S. 186, 197 [82 L.Ed. 187, 58 S.Ct. 233] (*Silas Mason*); accord, *Collins v. Yosemite Park & C. Co.* (1938) 304 U.S. 518, 528 [82 L.Ed. 1502, 58 S.Ct. 1009] (*Collins*); *Standard Oil Co. v. California* (1934) 291 U.S. 242, 244–245 [78 L.Ed. 775, 54 S.Ct. 381].) The extent of the United States jurisdiction over its property is a question of federal law. (*Silas Mason, supra,* at p. 197; *Paul v. United States* (1963) 371 U.S. 245, 267 [9 L.Ed.2d 292, 83 S.Ct. 426] (*Paul*).)

■ In contrast to having exclusive jurisdiction, the United States may have only a proprietary interest in land. (*Fort Leavenworth, supra,* 114 U.S. at p. 531.) As the Supreme Court has stated: "It is not unusual for the United States to own within a state lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the state." (*Surplus Trading Co. v. Cook* (1930) 281 U.S. 647, 650 [74 L.Ed. 1091, 50 S.Ct. 455].) "The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the States equally with the property of private individuals." (*Fort Leavenworth, supra,* at p. 531.) Thus, where the United States is the owner of land within a state and does not have exclusive jurisdiction over the land, the state may generally tax private possessory interests in, or private property situated on, such land. (*Surplus Trading Co. v. Cook, supra,* at p. 651; *People v. Shearer, supra,* 30 Cal. at pp. 655, 659–660; *United States of America v. County of Fresno* (1975) 50 Cal.App.3d 633, 638, 640 [123 Cal.Rptr. 548], affd. (1977) 429 U.S. 452 [50 L.Ed.2d 683, 97 S.Ct. 699].)

■ Exclusive jurisdiction can be acquired by the United States over land within a state in three ways: (1) by purchase or donation of property with the consent of the state as provided in the United States Constitution (U.S. Const., art. I, § 8, cl. 17;[3] *Humble Pipe Line Co. v. Waggonner* (1964) 376 U.S. 369, 371 [11 L.Ed.2d 782, 84 S.Ct. 857]); (2) by a reservation of jurisdiction by the United States upon the admission of the state into the union (*Fort Leavenworth, supra,* 114 U.S. at pp. 526–527); and (3) the state's cession, together with the United States acceptance, of such jurisdiction (*id.* at p. 539; *Silas Mason, supra,* 302 U.S. at pp. 207–208). It is only this third method which concerns us in this case.

The ability of a state to cede jurisdiction to the United States over federally owned land was established in *Fort Leavenworth.* In that case, the Supreme Court considered whether a private railroad owner whose railroad was situated on land owned by the United States and within the State of Kansas could be taxed by the State of Kansas. The subject land, Fort Leavenworth Military Reservation, was a portion of the land that France ceded to the United States in 1803. Upon the cession by France and prior to the admission of Kansas into the union in 1861, the federal government "possessed the

---

[3] The United States Constitution provides that Congress shall have the power to exercise "exclusive legislation . . . over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings . . . ." (U.S. Const., art. I, § 8, cl. 17.) The phrase "exclusive legislation" is synonymous with "exclusive jurisdiction." (*Surplus Trading Co. v. Cook, supra,* 281 U.S. at p. 652; *Johnson v. Morrill* (1942) 20 Cal.2d 446, 450 [126 P.2d 873]; see also *S. R. A. v. Minnesota, supra,* 327 U.S at p. 562 ["Exclusive legislative power is in essence complete sovereignty"].)

rights of a proprietor, and had political dominion and sovereignty over" the land. (*Fort Leavenworth, supra,* 114 U.S. at p. 526.) When the United States admitted Kansas into the Union, it did not reserve to itself jurisdiction over the land. As a result, although the United States continued to own the land, "the possession of the United States was only that of an individual proprietor. The State [of Kansas] could have exercised, with reference to it, the same authority and jurisdiction which she could have exercised over similar property held by private parties." (*Id.* at p. 527.)

In 1875, the Kansas Legislature "passed an Act entitled 'An Act to cede jurisdiction to the United States over the territory of the Fort Leavenworth Military Reservation.' " (*Fort Leavenworth, supra,* 114 U.S. at p. 528.) This act purported to cede to the United States "exclusive jurisdiction" over the Fort Leavenworth Military Reservation. (*Ibid.*) Whether the United States could constitutionally accept and exercise such jurisdiction was nevertheless unclear because the United States Constitution provided for the federal government's exclusive jurisdiction only over what would become the District of Columbia and other land *"purchased"* by the United States with a state legislature's consent. (U.S. Const., art. I, § 8, cl. 17, italics added; see *U.S. v. Warne* (1960) 190 F.Supp. 645, 651, affd. in part, vacated on other grounds *sub nom. Paul, supra,* 371 U.S. 245.) The United States Constitution did not provide a method for the federal government to obtain exclusive jurisdiction over land, such as Fort Leavenworth, that it *already owned* and therefore did not *purchase.* (*Benson v. United States* (1892) 146 U.S. 325, 330 [36 L.Ed. 991, 13 S.Ct. 60].) The court concluded that even though the Fort Leavenworth Military Reservation was not "purchased by the consent of the legislature" as expressed in the United States Constitution, Kansas's act to cede jurisdiction was, with the acceptance by the United States, effective to transfer jurisdiction to the federal government. (*Fort Leavenworth, supra,* at pp. 541–542.)

■ After the decision in *Fort Leavenworth,* it was clear that a state could transfer jurisdiction over land within its borders by either consenting to the purchase by the United States of such land (as provided in the United States Constitution) or enacting a statute ceding jurisdiction over federal land and having the United States accept such cession. *Fort Leavenworth* and subsequent cases also made clear that a state may limit or qualify its cession of jurisdiction. (See *Fort Leavenworth, supra,* 114 U.S. at p. 539; *James v. Dravo Contracting Co.* (1937) 302 U.S. 134, 147 [82 L.Ed. 155, 58 S.Ct. 208].) "The terms of the cession," the Supreme Court has stated, "to the extent that they may lawfully be prescribed, determine the extent of the Federal jurisdiction." (*United States v. Unzeuta* (1930) 281 U.S. 138, 142 [74 L.Ed. 761, 50 S.Ct. 284].) Thus, in ceding jurisdiction to the United States, a state may reserve to itself the power to regulate or tax private interests within

an area over which it otherwise cedes jurisdiction. (*Fort Leavenworth, supra,* at p. 539; *Collins, supra,* 304 U.S. at pp. 530, 533; accord, *Standard Oil Co. v. Johnson* (1938) 10 Cal.2d 758, 765–766 [76 P.2d 1184] (*Standard Oil*).)[4]

In 1848, Mexico and the United States entered into the Treaty of Guadalupe Hidalgo. (Feb. 2, 1848, 9 Stat. 922; see *Standard Oil, supra,* 10 Cal.2d at p. 760.) Pursuant to this treaty, Mexico relinquished to the United States sovereignty over California. (*Botiller v. Dominguez* (1889) 130 U.S. 238, 243–244 [32 L.Ed. 926, 9 S.Ct. 525].) While the property rights of Mexicans were to be respected under the treaty (*U.S. v. O'Donnell* (1938) 303 U.S. 501, 510–511 [82 L.Ed. 980, 58 S.Ct. 708]), title to land not privately held passed to the United States (*Thompson v. Doaksum* (1886) 68 Cal. 593, 596 [10 P. 199]; *Botiller v. Dominguez, supra,* at p. 243). Such land is sometimes referred to as the "public domain of the United States."[5] (See, e.g., *People v. Shearer, supra,* 30 Cal. at p. 658.) The parties agree that ownership of the land that is the subject of this action passed from Mexico to the United States pursuant to this treaty and that the United States has held title to such land continuously since that time.

Following the Treaty of Guadalupe Hidalgo and prior to California's admission into the Union, the ownership and jurisdictional status of the subject land was analogous to the land at issue in *Fort Leavenworth* prior to the admission of Kansas. (See *U.S. v. Bateman* (C.C.N.D. Cal. 1888) 34 F. 86, 88–89 [13 Sawy. 212].) The United States was not only the "proprietor" of the public domain property in California, but held "political dominion and sovereignty over" the land. (Cf. *Fort Leavenworth, supra,* 114 U.S. at p. 526; see *Botiller v. Dominguez, supra,* 130 U.S. at pp. 243–244.)

---

[4] In addition, the federal government, having received a cession of jurisdiction, may recede jurisdiction back to the states. In 1940, for example, Congress enacted the Buck Act (4 U.S.C. §§ 105–110), which gave to the states the power to impose income taxes on persons residing on federal land or on sales or uses occurring on land that would otherwise be within the exclusive jurisdiction of the United States. (4 U.S.C. §§ 105 & 106; see *Bowers v. Oklahoma Tax Commission* (S.D. Okla. 1943) 51 F.Supp. 652, 653.) As a result, "[m]ost of the detrimental effects of the traditional rule [prohibiting taxation of persons on federal enclaves] have been ameliorated by federal legislation receding to the States their power of taxation (Buck Act, 4 U.S.C. [§§] 105–110)." (Brown et al., Cal. Dept. of Justice, Jurisdiction over Federal Enclaves (1958) p. 61.) Inyo does not contend that its power to tax the Coso entities is based upon the Buck Act.

[5] The size of the area of this public domain land, either as it existed in 1891 or currently, is not in the record. According to the United States Bureau of Land Management, the federal government presently owns 48 percent of the land within the State of California; the State of California owns 5 percent of the land; and 47 percent is privately held. (U.S. Dept. of Interior, Bur. of Land Management Rep., Cal. Public Lands (2003) pp. 1–8 <www.blm.gov/pdfs/caso_pdfs/CA-publiclands.pdf> (as of Oct. 13, 2004).)

In 1850, the United States admitted the State of California into the Union. (Act for Admission of State of Cal. into Union, 9 Stat. 452.) As with the admission of Kansas 11 years later, the United States did not reserve to itself exclusive jurisdiction over its lands within the new state. (See *U.S. v. Bateman, supra,* 34 F. at p. 89.) Thus, as to such lands, the United States retained the "rights of an ordinary proprietor" (except as to lands used for "the execution of the powers of the General Government") and the State of California could generally exercise the same authority and jurisdiction it had over similar property owned by private parties. (*Fort Leavenworth, supra,* 114 U.S. at p. 527; *U.S. v. Bateman, supra,* at p. 89.)

In light of this background, the parties agree that from the time California was admitted to the Union until the enactment of the 1891 Statute, the United States had only proprietary interests in—and not exclusive jurisdiction over— the subject property. The fundamental question this case presents is whether the 1891 Statute changed this status.

B. *The 1891 Statute is Ambiguous*

The 1891 Statute provides: "Section 1. The State of California hereby cedes to the United States of America exclusive jurisdiction over such piece or parcel of land as may have been or may be hereafter ceded or conveyed to the United States, during the time the United States shall be or remain the owner thereof, for all purposes except the administration of the criminal laws of this State and the service of civil process therein. [¶] Sec. 2. This Act shall take effect immediately." (Stats. 1891, ch. 181, §§ 1 & 2, p. 262.) The trial court concluded that the 1891 Statute applied, as Inyo contended, "only to lands ceded *by California.*" (Italics added.) Because the land which is now the NWC was ceded to the United States *by Mexico,* and not by California, the statute did not effect a transfer of California's jurisdiction over NWC, and the Coso entities' property was therefore subject to taxation by Inyo.

The Coso entities' principal argument is that the trial court failed to interpret the 1891 Statute according to what they believe is its plain meaning, and improperly inserted the words "by California" into the statute. The words of the statute, the Coso entities argue, "mean just what they say." What the words "say," according to the Coso entities, is that California cedes exclusive jurisdiction over "all land ceded to the United States *without limitation as to time or identity of the ceding party.*" (Italics added.) The 1891 Statute, of course, does not expressly state this. Indeed, as we explain, it is the statute's failure to specify the "identity of the ceding party" that renders the statute ambiguous. We resolve this ambiguity in favor of the trial court's construction of the statute.

■ Our primary task in construing a statute is to ascertain the Legislature's intent to effect the purpose of the statute. (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227 [120 Cal.Rptr.2d 795, 47 P.3d 639].) "We begin by examining the statutory language because it generally is the most reliable indicator of legislative intent. [Citation.] We give the language its usual and ordinary meaning, and '[i]f there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs.' [Citation.] If, however, the statutory language is ambiguous, 'we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history.' [Citation.] Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute. [Citation.] Any interpretation that would lead to absurd consequences is to be avoided." (*Id.* at p. 227.)

The 1891 Statute begins plainly enough: "The state of California hereby cedes to the United States of America exclusive jurisdiction over such piece or parcel of land . . . ." (Stats. 1891, ch. 181, § 1, p. 262.) According to this clause, the State of California purports to cede exclusive jurisdiction to the United States over the land described in the statute. It is the description of the land in the next clause that concerns us in this case. The land over which exclusive jurisdiction is ceded is land "as may have been or may be hereafter ceded or conveyed to the United States . . ." (the land description clause). (*Ibid.*) The Coso entities contend that this language is plain and unambiguous and therefore requires no construction or interpretation. We disagree.

■ The land description clause is written in the "passive voice" without identifying the actor that has "ceded or conveyed," or will cede or convey, land to the United States. When a legislature writes a statute in such a manner, the failure to indicate the actor can render the statute ambiguous and make its meaning "somewhat difficult to ascertain." (*United States v. Wilson* (1992) 503 U.S. 329, 334–335 [117 L.Ed.2d 593, 112 S.Ct. 1351]; see also *N.A.A.C.P. v. American Family Mut. Ins. Co.* (7th Cir. 1992) 978 F.2d 287, 298.) By using the passive voice and failing to disclose the ceding or conveying party in the land description clause, we are required to infer or imply the intended actor. (See *U.S. v. Brumbaugh* (7th Cir. 1990) 909 F.2d 289, 291.) Had the clause been written in the active voice, the identity of the ceding or conveying party would have been necessarily disclosed. The statute could have been drafted in the active voice to read, for example, "land that *the State of California* ceded or conveyed or hereafter cedes or conveys to the United States . . . ." Alternatively, if the Legislature's intent was as the Coso entities contend, the statute could have been drafted to read, "land that *anyone* ceded or conveyed or hereafter cedes or conveys to the United States . . . ." From the plain text alone, we cannot be certain whether the statute applies to land ceded or conveyed by anyone, by the State of California, or

some other actor or actors. (Cf. *Harbor Bancorp & Subsidiaries v. C.I.R.* (9th Cir. 1997) 115 F.3d 722, 732–733.)

 A sentence or clause written in the passive voice is not necessarily ambiguous. The identity of the actor may be clear in light of the statutory scheme (see, e.g., *E. I. Du Pont de Nemours & Co. v. Train* (1977) 430 U.S. 112, 128–129 [51 L.Ed.2d 204, 97 S.Ct. 965]; *Ajala v. U.S. Parole Com'n* (9th Cir. 1993) 997 F.2d 651, 655; *People v. Cook* (1998) 61 Cal.App.4th 1364, 1371, fn. 13 [72 Cal.Rptr.2d 183]), when the apparent intent of the legislative body is to allow anyone to be the actor (see, e.g., *Special Devices, Inc. v. OEA, Inc.* (Fed. Cir. 2001) 270 F.3d 1353, 1355), or when the actor is indefinite or unknown (see *U.S. v. Clemons* (3d Cir. 1988) 843 F.2d 741, 751, fn. 11). The Coso entities, while conceding that the use of the passive voice in statutes can result in uncertainty, argue that this is a case in which "the actor's identity is obvious from the circumstances." The "obvious" actors, according to the Coso entities, are "all who cede or convey land to the United States." We disagree.

Initially, we note that the subject of the sentence and lone actor in the initial clause—"The State of California hereby cedes to the United States of America exclusive jurisdiction over such piece or parcel of land"—is the State of California. It is the next clause—"as may have been or may be hereafter ceded or conveyed to the United States"—that fails to disclose the actor ceding or conveying land. It is reasonable to infer that the undisclosed actor in the second clause is the same actor specified in the first; the lack of disclosure in the second instance can be attributed to the desire to avoid redundancy. (See, e.g., *Lehrfeld v. Richardson* (D.C. Cir. 1998) 328 U.S. App. D.C. 117 [132 F.3d 1463, 1465–1466].) Having just specified the State of California as the actor ceding jurisdiction at the beginning of the sentence, the drafters would likely have viewed restating the name of the actor as to the transfer of land in the next clause of that sentence as unnecessarily repetitive. (Cf. *DaimlerChrysler v. State Tax Assessor* (Me. 2003) 2003 ME 27 [817 A.2d 862, 865].) Indeed, if someone other than the only specified actor in the sentence, the State of California, was intended to be the actor as to the ceding or conveying of land, we would reasonably expect the Legislature to have made that clear by identifying the different actor. The statute, however, includes no language suggesting an actor other than the State of California. In light of the entire statute, the land description clause is thus more reasonably read as referring to land ceded or conveyed *by the State of California* rather than *by all who cede or convey land to the United States*. At a minimum, we cannot say that the Coso entities' proposed actor is so obvious or clear from the statute as to preclude judicial efforts to construe it. (See *Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995 [111 Cal.Rptr.2d 564, 30 P.3d 57].)

## C. *Legislative History Provides No Meaningful Indication of the Legislature's Intent*

██ When a statute is ambiguous, courts can look to legislative history in aid of ascertaining legislative intent. (*People v. Robles* (2000) 23 Cal.4th 1106, 1111 [99 Cal.Rptr.2d 120, 5 P.3d 176].) However, we consider legislative history "as dispositive only when that history is itself unambiguous." (*Medical Bd. of California v. Superior Court* (2003) 111 Cal.App.4th 163, 179 [4 Cal.Rptr.3d 403].) Here, there is scant evidence of legislative history concerning the 1891 Statute, and what there is provides little help in ascertaining the Legislature's intent. Indeed, both parties point to the absence of meaningful legislative history to support their positions. The Coso entities argue, in essence, that the lack of legislative history precludes us from looking beyond what they contend is the plain meaning of the statute. Inyo, on the other hand, points out that the available legislative history "does not explain . . . why the State would have wanted to cede its jurisdiction over all of the public domain to the United States in 1891."[6] The problem, however, is that the legislative history, to the extent any exists, does not provide *any* reliable explanation for the enactment of the statute. We must therefore look to other interpretative aids to shed light on what Inyo fairly describes as "the rather enigmatic Statute of 1891."

## D. *The Coso Entities' Interpretation is Unreasonable*

In response to the brief of amici curiae, the Coso entities assert that the unstated actors in the 1891 Statute are "all who cede or convey land to the United States." This view of the statute is irrational and would produce absurd results because it would render the state's legislative and taxing authority over public domain lands dependent upon the actions of others.

By the terms of the 1891 Statute, California cedes jurisdiction over both (1) land that has been previously ceded or conveyed and (2) land that is "hereafter" ceded or conveyed to the United States. There is no distinction made between the actor that ceded or conveyed land prior to the enactment of the statute and the actor that cedes or conveys land after its enactment. To the extent the transfer of land occurs after the enactment of the statute, the 1891 Statute appears to cause a cession of the state's jurisdiction whenever the land is ceded or conveyed to the United States. (Stats. 1891, ch. 181, § 1, p. 262.) The statute thus gives to the unnamed actor or actors the power to

---

[6] Inyo offered the testimony of an expert on legislative intent concerning the 1891 Statute. This expert testified that the legislators who passed the 1891 Statute believed that they were passing a bill to cede jurisdiction over a site for a post office and federal building in San Francisco. Inyo does not rely upon this expert's testimony on appeal or assert that the 1891 Statute should be interpreted so narrowly.

abrogate California's jurisdiction over land by simply ceding or conveying it to the United States. This loss of authority to legislate, regulate, or levy taxes concerning such land would occur as and whenever that land is conveyed. The issue thus becomes, in enacting the 1891 Statute, who did the Legislature intend to have the power to cause the cession of the state's jurisdiction to the United States?

If the statute is read as the Coso entities urge, then the class of actors includes virtually anyone who owns or acquires California land and conveys the land to the United States. The resulting loss of jurisdiction (and tax revenue) would occur by the mere operation of the statute without any further action, approval, or even knowledge of the transfer, by the State of California. A business or other entity seeking to avoid compliance with California regulations or paying state or county taxes, for example, could convey its land to the United States in exchange for the right to operate on the land, and inform the state and county it is now operating within a "federal enclave" beyond California's jurisdiction. Such an extraordinary delegation of the state's power to assert or transfer its jurisdiction has no reasonable or rational basis and would produce patently absurd consequences.[7]

By contrast, if the actor associated with such subsequent ceding or conveying of land is the State of California, the cession of jurisdiction over such land is unremarkable and eminently rational. In that case, the state retains complete control over the timing and circumstances by which jurisdiction is ceded as well as the decision as to what land California's jurisdiction will be relinquished. Land owned by the State of California would, of course, be ceded or conveyed only by the state's authority and with its knowledge. As the ceding party or conveyor of the property, it would be aware that such action would carry with it, by operation of the 1891 Statute, a cession of exclusive jurisdiction over the same property. The state would at all times be in control of its power to retain, qualify, or withdraw its jurisdiction as appropriate under the circumstances.

Where the language of a statute is susceptible of two constructions, one of which will be reasonable in its application and the other produce

---

[7] At oral argument, the Coso entities narrowed their proposed construction of the statute, arguing that the statute does not apply to "all" who cede or convey land to the United States, but rather to "any *sovereign*" who cedes or conveys land. So construed, the statute would apply to cessions and conveyance by Mexico prior to 1848 and by California after 1848. While this construction would not produce the unreasonable consequences described in this part, the Coso entities offer no persuasive explanation as to why the unidentified party ceding or conveying land under the statute would be "any sovereign," rather than "California." As stated above, having referred to the "State of California" at the outset of the sentence, we would expect that if the Legislature had intended the unidentified actor in the land description clause to be "any sovereign" (or anyone other than the State of California) it would have so specified.

absurd consequences, we will adopt the former. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1166 [278 Cal.Rptr. 614, 805 P.2d 873].) Here, the issue is the identity of the ceding or conveying party in the land description clause. The Legislature's failure to expressly identify that party has resulted in two susceptible interpretations: the Coso entities' actor (anyone who cedes or conveys land to the United States) and Inyo's actor (the State of California). Because application of the Coso entities' interpretation of the statute would be irrational and lead to absurd results, while Inyo's interpretation is rational and would avoid absurd results, we reject the former and adopt the latter.

The interpretation urged by Inyo is also reasonable in light of the pre-1891 California land grants to the United States. In 1852, the California Legislature enacted a so-called consent statute, in which the state expressed its consent to the purchase by the United States of land within California "for the purpose of erecting thereon Armories, Arsenals, Forts, Fortifications, Navy Yards, or Dock Yards, Magazines, Custom Houses, Light Houses, and other needful public buildings or establishments whatsoever . . . ." (Stats. 1852, ch. 76, § 1, p. 149, codified in 1872 as Pol. Code, § 34 (1852 Statute).) Such consent was expressly made to be in accordance with the United States Constitution, which provides for the acquisition by the United States of exclusive jurisdiction over land purchased by the United States for purposes similar to those described in the 1852 Statute.[8] Thus, after 1852, a purchase of land for one or more of the specified purposes by the United States would, by operation of the 1852 Statute and the United States Constitution, effect a cession of exclusive jurisdiction over such land. Between 1852 and 1891, California occasionally granted, or authorized the grant of, land to the federal government. Some of these grants of land were expressly for one or more of the purposes set forth in the 1852 Statute. (See, e.g., Stats. 1854, ch. 36, § 3, pp. 41–42 [custom house]; Stats. 1855, ch. 41, § 1, p. 45 [military purposes]; Stats. 1859, ch. 36, § 1, p. 26 [lighthouses]; Stats. 1867, ch. 14, § 1, p. 8 [military purposes]; Stats. 1868, ch. 520, § 1, p. 687 [custom house].) As to such grants, exclusive jurisdiction would appear to have been transferred to the United States along with title to the property by operation of the 1852 Statute and the United States Constitution. Other grants of land by California to the United States, however, were for either unspecified reasons or for purposes not clearly within those specified in the 1852 Statute. (See, e.g.,

---

[8] See footnote 3, *supra*. In 1872, California enacted section 34 of the former Political Code, which codified (with modifications) the 1852 Statute. This section provides: "The legislature consents to the purchase or condemnation by the United States of any tract of land within this state for the purpose of erecting forts, magazines, arsenals, dockyards, and other needful buildings, upon the express condition that all civil process issued from the courts of this state, and such criminal process as may issue under the authority of this state, against any person charged with crime, may be served and executed thereon in the same mode and manner and by the same officers as if the purchase or condemnation had not been made."

Stats. 1872, ch. 635, § 1, pp. 948–949 [property "released" to the United States for unspecified purposes]; Stats. 1876, ch. 153, § 1, p. 154 [grant authorized to change the course of river]; Stats. 1887, ch. 51, § 1, p. 59 [for a breakwater to "improve" entrance to Humboldt Bay]; Stats. 1889, ch. 166, § 1, p. 201 [same].) Because such lands are not clearly for any of the purposes described in the 1852 Statute, their jurisdictional status was at best ambiguous prior to 1891. In enacting the 1891 Statute, the Legislature did not limit the cession of jurisdiction to property used only for certain purposes; and, by applying to land previously ceded or conveyed, it encompassed prior grants of California property that were not covered by the 1852 Statute. The 1891 Statute can thus be reasonably viewed as an attempt to clarify and remove any doubt as to the jurisdictional status of property previously granted by the State of California to the United States for purposes other than those set forth in the 1852 Statute.

E. *Subsequent Legislation Cannot Be Harmonized with the Coso Entities' Interpretation*

 When a legislature enacts a law, it presumably has in mind prior statutes relating to the same subject matter. (*McCurter v. Older* (1985) 173 Cal.App.3d 582, 592 [219 Cal.Rptr. 104], disapproved of on another point in *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1137 [275 Cal.Rptr. 797, 800 P.2d 1227].) Thus, if possible, we will construe statutes on the same subject to be in harmony with each other. (*Brusso v. Running Springs Country Club, Inc.* (1991) 228 Cal.App.3d 92, 101 [278 Cal.Rptr. 758]; *Woodard v. Southern Cal. Permanente Medical Group* (1985) 171 Cal.App.3d 656, 664 [217 Cal.Rptr. 514].)

Following the enactment of the 1891 Statute, the California Legislature enacted several statutes ceding jurisdiction to the United States over land that, if the Coso entities' view was correct, was already under exclusive federal jurisdiction by way of the 1891 Statute. (See, e.g., Stats. 1897, ch. 56, § 1, pp. 51–52 (1897 Statute) [ceding jurisdiction over land held by United States for military purposes]; Stats. 1919, ch. 51, § 1, p. 74 (1919 Statute) [ceding jurisdiction over land for Yosemite National Park]; Stats. 1927, ch. 207, § 1, p. 376 [ceding jurisdiction over land for Lassen Volcanic National Park]; Stats. 1943, ch. 96, § 1, p. 801 [ceding jurisdiction over land for Kings Canyon National Park].) If the 1891 Statute is given the interpretation urged by Inyo, these statutes (together with the United States' acceptance) would effectively cede jurisdiction over the land described in the subsequent statutes. If, on the other hand, the 1891 Statute effected a cession of jurisdiction over all public domain land held by the United States at that time, as well as over all land subsequently ceded or conveyed by anyone, as the Coso entities contend, these later statutes would be unnecessary and superfluous. Two of the

statutes—the 1897 Statute and the 1919 Statute—have been the subject of judicial decisions and bear further discussion.

The 1897 Statute provides: "The State of California hereby cedes to the United States of America exclusive jurisdiction over all lands within this State now held, occupied, or reserved by the Government of the United States for military purposes or defense, or which may hereafter be ceded or conveyed to said United States for such purposes . . . ." (Stats. 1897, ch. 56, § 1, pp. 51–52.) If the Coso entities' interpretation of the 1891 Statute was correct, there would have been no need for the 1897 Statute because jurisdiction over the land described in the later statute ("land now held, occupied, or reserved by the Government of the United States for military purposes or defense") would have been, according to the Coso entities, ceded to the United States under the 1891 Statute. If, on the other hand, the 1891 Statute is construed such that the cession of jurisdiction did not cover land that *anyone* (including Mexico) ceded or conveyed to the United States, but covered only land that had been ceded or conveyed *by the State of California*, then the 1897 Statute would be effective in ceding jurisdiction over public domain lands regardless of how the United States came to own it, provided it was used for military purposes or defense. This latter construction of the 1891 Statute thus gives effect to the 1897 Statute, whereas the Coso entities' construction would render it virtually meaningless. "We do not presume that the Legislature performs idle acts, nor do we construe statutory provisions so as to render them superfluous." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 22 [276 Cal.Rptr. 303, 801 P.2d 1054].)

This view of the relationship between the 1891 Statute and the 1897 Statute finds further support in a 1958 publication by the California Attorney General. The 1897 Statute, the Attorney General stated, "ceded jurisdiction over lands held by the United States for military purposes, which had been so held at the time California entered the Union. Such lands, prior to this statute, had been held to be within the jurisdiction of the State because [they were] not 'purchased by, conveyed, or ceded to' the United States and therefore not within the terms of . . . the cession statute of 1891." (Brown et al., Cal. Dept. of Justice, Jurisdiction Over Federal Enclaves, *supra*, at p. 7.) The Attorney General thus viewed land "held [by the United States] at the time California entered the Union," such as land "ceded" by Mexico, as land that had *not* been ceded or conveyed to the United States within the meaning of the 1891 Statute. Jurisdiction over such land would, however, have been ceded to the United States by the 1897 Statute (so long as it was used for military purposes or defense).[9]

---

[9] The Coso entities also find support in the Attorney General's 1958 report. The report states: "Since the 1897 statute dealt specifically with lands used for military purposes, the 1891 statute would apply only to such lands acquired between the two dates. However, it would apply to <u>all other</u> types of acquisitions up to 1939, when Political Code, section 34, superseded

The Coso entities rely upon *U.S. v. Watkins* (1927) 22 F.2d 437 (*Watkins*), which discussed both the 1891 Statute and the 1897 Statute. In *Watkins*, the court was faced with the issue of whether the United States had jurisdiction over the Presidio of San Francisco. The court noted that the Presidio had been ceded by Mexico to the United States pursuant to the Treaty of Guadalupe Hidalgo, and used as a military reservation since that time. (*Id.* at p. 438.) Upon California's admission into the Union, the land "passed, without reservation of jurisdiction, to the state of California; the proprietary ownership remaining in the United States." (*Ibid.*) The court reviewed the history of California's jurisdiction cession laws and stated: "Under the authority of the Ft. Leavenworth Case it may well be said that the language of the [1891 Statute] ceded exclusive jurisdiction of the Presidio reservation to the United States." (*Ibid.*) Nevertheless, the court continued, "evidently the act of 1891 was thought insufficient to confer exclusive jurisdiction in the United States, for in 1897 we find the state Legislature again passing upon the subject [by enacting the 1897 Statute]." (*Id.* at p. 439; see also *Standard Oil Co. v. California, supra,* 291 U.S. at pp. 244, 245 [exclusive jurisdiction over the Presidio of San Francisco ceded by 1897 Statute without reference to 1891 Statute].)

The court then applied the 1897 Statute to the facts and concluded that the conditions applicable to the 1897 Statute had been fulfilled and there was sufficient evidence of acceptance of the cession of jurisdiction. (*Watkins, supra,* 22 F.2d at pp. 439–441.) The court therefore held that the United States had jurisdiction. (*Id.* at p. 441.) At most, the *Watkins* court's comment as to what "may well be said" of the 1891 Statute is dictum, as the decision in the case turned on the application of the terms of the 1897 Statute. Moreover, any value the comment might have had was undercut by the court's statement that the 1891 Statute "was thought insufficient to confer exclusive jurisdiction in the United States." For our purposes, *Watkins* provides no guidance or persuasive weight.

In the 1919 Statute, the California Legislature ceded exclusive jurisdiction over Yosemite National Park and certain other lands.[10] The United States

---

it." (Brown et al., Cal. Dept. of Justice, Jurisdiction Over Federal Enclaves, *supra*, at p. 16.) This statement suffers from the same flaw as the 1891 Statute—the Attorney General's reference to "acquisitions" does not identify from whom the acquisition is made. To the extent the report suggests that the 1891 Statute would include acquisitions by the United States from persons or entities other than California, it is rejected.

[10] This statute provides: "Exclusive jurisdiction shall be and the same is hereby ceded to the United States over and within all of the territory which is now or may hereafter be included in those several tracts of land in the State of California set aside and dedicated for park purposes by the United States as 'Yosemite national park,' 'Sequoia national park,' and 'General Grant national park' respectively; saving, however, to the State of California the right to serve civil or criminal process within the limits of the aforesaid parks in suits or prosecutions for or on

Congress expressly accepted the cession of jurisdiction in 1920. (16 U.S.C. § 57; *Collins, supra,* 304 U.S. at pp. 523–525, 527.) Some of the land that is the subject of this statute had been owned by the United States continuously since it was acquired under the Treaty of Guadalupe Hidalgo. (*Ibid.*) Other portions of the land were ceded by California to the United States in 1905. (Stats. 1905, ch. 60, § 1, p. 54; *Collins, supra,* at p. 523.) If the Coso entities' construction of the 1891 Statute is correct, California ceded to the United States in 1891 California's jurisdiction over land that had been continuously held by the United States. (Under either the Coso entities' construction or Inyo's construction of the 1891 Statute, the 1891 Statute operated to effect a cession of jurisdiction over the portion of the land that California ceded to the United States in 1905.) As with the 1897 Statute, if the Coso entities' view was adopted, the 1919 Statute would have accomplished nothing. According to both the United States Supreme Court and our state Supreme Court, however, this statute, along with the express acceptance by the United States, was effective to transfer jurisdiction to the United States. (See *Collins, supra,* at p. 527; *Standard Oil, supra,* 10 Cal.2d at p. 766.)

In addition to the inconsistencies between the Coso entities' interpretation of the 1891 Statute and the post-1891 cession statutes, the Coso entities' interpretation is also inconsistent with statutes enacted after 1891 which assume California's continuing jurisdiction over federal lands. (See, e.g., Stats. 1897, ch. 159, § 1, p. 214 [law for the making and perfection of "mining claims upon the public domain of the United States"]; Stats. 1937, ch. 361, § 1, p. 780 [protection of wildflower reserves on federal land]; Fish & G. Code, § 711.7 [regulating fishing and hunting on federal land].) The enactment of the Political Code in 1895 (Stats. 1895, ch. 218, § 2, p. 308), for example, provided for the collection of taxes on certain interests in property "growing or being on the lands of the United States, and all rights and privileges appertaining thereto." (*Id.* at §§ 2, 86, pp. 310, 335.) By the time this code was enacted, California's jurisdiction over the "lands of the United States" had, according to the Coso entities' view, been ceded to the United States four years earlier. If true, this aspect of the Political Code would therefore have been ineffective. (See *Paul, supra,* 371 U.S. at p. 268 [a state may not legislate with respect to federal enclaves unless it reserved the right to do so].)

---

account of rights acquired, obligations incurred or crimes committed in said state outside of said parks; and saving further, to the said state the right to tax persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks; and saving also to the persons residing in any of said parks now or hereafter the right to vote at all elections held within the county or counties in which said parks are situate; *provided, however,* that jurisdiction shall not vest until the United States through the proper officer notifies the State of California that they assume police jurisdiction over said parks." (Stats. 1919, ch. 51, § 1, p. 74.)

■ While acknowledging the practice of taxing possessory interests on federal land, the Coso entities contend that such "taxes were unlawful by virtue of the 1891 Statute." Courts have, however, repeatedly upheld California's practice of taxing possessory interests on United States land. (See, e.g., *Atlantic Oil Co. v. County of Los Angeles* (1968) 69 Cal.2d 585, 594–595 [72 Cal.Rptr. 886, 446 P.2d 1006]; *Bakersfield etc. v. Kern County* (1904) 144 Cal. 148, 152–153 [77 P. 892]; *United States of America v. County of Fresno, supra,* 50 Cal.App.3d at p. 640; *International Paper Co. v. Siskiyou County* (9th Cir. 1974) 515 F.2d 285, 287.) In any event, our task is to harmonize, if possible, the 1891 Statute and the statute enacted a few years later permitting taxation of possessory interests on federal land. We cannot do that if we adopt the Coso entities' interpretation; the laws permitting such taxation would have to be declared unlawful. The two laws can, however, be harmonized to avoid harm to either, by interpreting the 1891 Statute as the trial court did.

## F. Statutes Derogating State's Sovereignty Must Be Construed Narrowly

■ Our construction of the 1891 Statute is further supported by the rule that statutes restricting or derogating the state's sovereignty should be strictly construed in favor of the state. (See *People v. Centr-O-Mart* (1950) 34 Cal.2d 702, 703–704 [214 P.2d 378].) In *Standard Oil,* our state Supreme Court considered the scope of a reservation of the taxing power in the 1919 Statute ceding jurisdiction to the United States over land for Yosemite National Park.[11] The court there stated the following "pertinent considerations": " '[I]t will not be presumed, in the absence of clearly expressed intent, that the state has relinquished its sovereignty . . . The taxing power of the state is never presumed to have been relinquished unless the language in which the surrender is made is clear and unmistakable.' " (*Standard Oil, supra,* 10 Cal.2d at p. 767, quoting *Ryan v. State* (Wn. 1936) 188 Wn. 115 [61 P.2d 1276, 1283].)

There is no question that the 1891 Statute, expressly ceding jurisdiction to the United States, is a law relinquishing the state's sovereignty. It is the extent of the relinquishment of its sovereignty that is at issue in this case. Far from establishing a "clear and unmistakable" intent to cede jurisdiction over California land previously, or ever, ceded or conveyed *by anyone* to the United States, the language of the 1891 Statute is, as we explained above, ambiguous at best. In light of the rule strictly construing statutes such as this in favor of state sovereignty, such ambiguity weighs heavily against the Coso entities' interpretation.

---

[11] See footnote 10, *ante.*

## G. *The Coso Entities' Further Arguments Are Unpersuasive*

The Coso entities contend that the Legislature's use of the word "cede" in the land description clause refers to the transfer of land effected by the Treaty of Guadalupe Hidalgo because none of the statutes by which California transferred land to the United States up to that time used that term. (See, e.g., Stats. 1854, ch. 36, § 1, pp. 41–42; Stats. 1868, ch. 520, § 1, p. 687; Stats. 1872, ch. 635, § 1, pp. 948–949; Stats. 1876, ch. 153, § 1, p. 154; Stats. 1887, ch. 51, § 1, p. 59; Stats. 1889, ch. 166, § 1, p. 201.) Land that "may have been ceded" to the United States, the Coso entities therefore argue, must refer to the "cession" of land by Mexico. The argument is unpersuasive for two reasons. First, while California apparently did not use the term "cede" in statutes transferring title to land to the United States prior to 1891, neither did the Treaty of Guadalupe Hidalgo. Rather, the transfer of land from Mexico to the United States occurred by operation of the setting of a new boundary line following a war between the two nations. (Feb. 2, 1848, 9 Stat. 922, art. V, pp. 926–927.) Both parties agree that the words "cede" and "cession" generally refer to transfers of land or jurisdiction between two sovereigns or governments. The parties further agree that the words "cede" and "cessions" do not refer solely to transfers of territory by sovereign nations, such as Mexico and the United States, to the exclusion of transfers by states, such as the State of California. Thus, just as the transfer of land accomplished by the Treaty of Guadalupe Hidalgo could be, and has been, described as a "cession" of land (see, e.g., *Botiller v. Dominguez, supra,* 130 U.S. at pp. 243–244; *Standard Oil, supra,* 10 Cal.2d at p. 760), the pre-1891 transfers of land by the State of California to the United States can just as easily be described as "cessions" of land.

Second, the word "ceded" in the land description clause applies not only to land *previously* ceded to the United States, but to land that is ceded to the United States *after 1891.* There is no basis in the text or otherwise to conclude that the Legislature intended the party ceding land before 1891 to be different from the party ceding land thereafter. Yet, Mexico certainly would not be ceding land within California to the United States after 1891. Thus, if "ceding" refers to transfers by a sovereign, the only actor that reasonably could have ceded land to the United States before 1891 as well as thereafter ceded land to the United States was the State of California.

The Coso entities argue that the reference to a land-ceding party after 1891 could refer to "other states in the United States." Other states, they contend, may "occasionally" own land within California's borders. The 1891 Statute could then apply to a cession by such other state to the United States. The

Coso entities do not explain why another state would acquire land within California. In any event, an interpretation of the 1891 Statute that would permit other states to unilaterally trigger the abrogation of California's jurisdiction is neither plausible nor reasonable.

The Coso entities, relying upon Civil Code sections 1069, 1084, and 1107, next contend that their interpretation of the statute is consistent with the rule that grants of real property shall be interpreted "in favor of the grantee, here the United States." The 1891 Statute is not, however, a grant of real property to the United States. It is an act purporting to cede jurisdiction. The Civil Code statutes relied upon by the Coso entities have no application to the 1891 Statute.

Finally, the Coso entities rely upon a statement made by the California Attorney General in a brief filed with the United States Supreme Court in *Paul, supra,* 371 U.S. 245. In that brief, the Attorney General, discussing a 1943 codification of the 1897 Statute,[12] stated that the word "ceded" in that statute "refers to lands within state borders which came into United States ownership because of their cession by Mexico . . . ." The Attorney General cited only the Treaty of Guadalupe Hidalgo, which does not use the word "cede." While not expressly rejecting the Attorney General's argument, the Supreme Court did not see fit to adopt the Attorney General's view of the meaning of the word "cede." (See *Paul, supra,* at pp. 267–268.)

H. *The Trial Court's Finding of No Acceptance of Jurisdiction by the United States is Supported by Substantial Evidence*

██ Even if the 1891 Statute ceded exclusive jurisdiction of land ceded to the United States by Mexico, the cession of jurisdiction must be accepted by the United States. (Cf. *Silas Mason, supra,* 302 U.S. at p. 207.) As explained in *Silas Mason,* because a transfer of exclusive jurisdiction over land "rests upon a grant by the State, through consent or cession, it follows, in accordance with familiar principles applicable to grants, that the grant may be accepted or declined." (*Ibid.*)

██ Prior to the enactment of former section 255 of title 40 of the United States Code in 1940, acceptance of a cession of jurisdiction by the United

---

[12] *The 1943 statute provided:* "The State cedes to the United States exclusive jurisdiction over all lands within this State held, occupied, or reserved on March 2, 1897 by the United States for military purposes or defense, and over all lands which thereafter has been or which may be ceded or conveyed to the United States for such purposes reserving the authority to serve and execute process, and the State's entire power of taxation. A sufficient description by metes and bounds and a map or plat of the lands shall first be filed in the proper office of record in the county in which the lands are situated." (Stats. 1943, ch. 134, art. 2, pp. 898–899, codified as Gov. Code, § 114, repealed by Stats. 1947, ch. 1532, § 3, p. 3164.)

States was presumed if the United States benefited from the cession and did not "dissent" or indicate its lack of acceptance of the cession.[13] (*Fort Leavenworth, supra,* 114 U.S. at p. 528; *Silas Mason, supra,* 302 U.S. at pp. 207–208; *People v. Brown* (1945) 69 Cal.App.2d 602, 603 [159 P.2d 686].) A statute purporting to cede exclusive jurisdiction does not, by itself, confer a benefit upon the United States sufficient to trigger a presumption of acceptance. In *Silas Mason,* the court stated: "Acceptance may be presumed in the absence of evidence of a contrary intent, but we know of no constitutional principle which compels acceptance by the United States of an exclusive jurisdiction contrary to its own conception of its interests. The mere fact that the Government needs title to property within the boundaries of a State, which may be acquired irrespective of the consent of the State [citation], does not necessitate the assumption by the Government of the burdens incident to an exclusive jurisdiction." (*Silas Mason, supra,* at pp. 207–208.) Such "burdens" include fire protection, refuse and garbage collection, road maintenance, law enforcement, and other services ordinarily performed by state or local governments. (U.S. Interdeptal. Com. for Study of Jurisdiction over Federal Areas Within States, Jurisdiction over Federal Areas Within the States (1956) pt. I, pp. 50–52.)

■ A presumption arises when the foundational facts for the presumption are established. (Evid. Code, § 600; *Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 421 [100 Cal.Rptr.2d 818].) The relevant foundational facts here are the conferring of a benefit to the United States and the absence of indication by the United States that it was not accepting the offered cession. As the proponent of the presumption, the Coso entities had the burden of proving these foundational facts. (See *Xebec Development Partners, Ltd. v. National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501, 545 [15 Cal.Rptr.2d 726]; *United Sav. & Loan Assn. v. Reeder Dev. Corp.* (1976) 57 Cal.App.3d 282, 300 [129 Cal.Rptr. 113].) The Coso entities did not offer any evidence at trial, nor do they present any argument on appeal, that the purported cession of jurisdiction over NWC conferred any benefit upon the United States. Assuming that the 1891 Statute was an effort to cede jurisdiction over public domain lands, the Coso entities failed to establish the foundational fact that the purported cession of jurisdiction was beneficial to the United States.

---

[13] Until 2002, section 255 stated, in part: "Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted." (Former 40 U.S.C. § 255.) The relevant portion of former section 255 was revised and recodified as section 3112(c) of title 40 of the United States Code in 2002, to state: "It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section."

█ The absence of any indication of dissent by the United States to a beneficial cession of jurisdiction implies, at a minimum, that the federal government has knowledge of the scope of a state's purported cession of jurisdiction. A state cannot, of course, act to cede jurisdiction over some limited territory then, following the federal government's failure to expressly reject such a cession, announce that the cession statute was intended to cede jurisdiction over a much larger territory and that the United States was bound by its silence. Here, even if the United States was aware of the 1891 Statute, there was no substantial evidence presented that the United States ever viewed the 1891 Statute as effecting a cession of jurisdiction over either public domain land in general or NWC in particular. Thus, even if the federal government was silent in the face of the 1891 Statute, such silence cannot be reasonably interpreted as passive acquiescence to the transfer of jurisdiction over all public domain land in California. It thus appears from the record that the Coso entities failed to establish the foundational facts necessary to support the presumption of acceptance.

█ Even if the presumption of acceptance did arise in this case, the presumption is rebuttable, not conclusive. (See *Silas Mason, supra,* 302 U.S. at pp. 207–209.) Here, the court concluded that "the presumption of acceptance has been rebutted and that [exclusive jurisdiction under the 1891 Statute] has not been accepted." We will accept the trial court's determination if it is supported by substantial evidence. (*People v. Mayfield* (1997) 14 Cal.4th 668, 733 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 51 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

█ Inyo relied primarily upon the testimony of James Frey, the Senior Staff Counsel for the California State Lands Commission (CSLC). The CSLC is required to "prepare and maintain an adequate index or record of documents with description of the lands over which the United States acquired jurisdiction pursuant to Section 126 of [the Government] code or pursuant to any prior state law." (Gov. Code, § 127.) This "index shall record the degree of jurisdiction obtained by the United States for each acquisition." (*Ibid.*) In preparing this index, the CSLC must determine the nature of jurisdiction on federal property within California. Frey is the person at the agency responsible for making these determinations.

Frey testified that based upon his review of CSLC records, the 1891 Statute had never been applied or interpreted by either the State of California or the United States as effecting a transfer of exclusive jurisdiction over "public

domain" land acquired by the United States prior to California's statehood. Frey further testified that if the 1891 Statute could be read as transferring jurisdiction over public domain land, the United States had never accepted such jurisdiction. Indeed, the United States has, since 1891, repeatedly requested cessions of jurisdiction from California over specific public domain land—requests that would not be necessary if the 1891 Statute had ceded jurisdiction over such land. As to the subject property in this case, Frey stated that the United States never accepted jurisdiction over NWC and has only "proprietorial jurisdiction" over such property.[14]

Inyo also provided the testimony of Jack Goodrich, the Undersheriff of Inyo County. Goodrich testified that the county sheriff's department provides emergency and other police services within NWC. Although the NWC has its own security force, which has requested permission to handle police matters on the property, Goodrich testified that the Inyo County Sheriff's Department has denied the request and has not released its authority over the area to the NWC police.

Frey's and Goodrich's testimony constitute evidence sufficient to support a finding of a lack of acceptance by the United States. Although the Coso entities challenge the credibility of these witnesses, they produced no substantial evidence that the United States accepted exclusive jurisdiction over the NWC under the 1891 Statute or otherwise. Accordingly, even if the 1891 Statute was construed as the Coso entities contend, the findings concerning the lack of acceptance of such jurisdiction by the United States must be accepted and the judgment affirmed.[15]

---

[14] Frey relied upon numerous documents and records of the CSLC reflecting an understanding on the part of both state and federal officials that the United States' jurisdiction over public domain land in general, and NWC in particular, is not exclusive, that the 1891 Statute did not give the United States exclusive jurisdiction over military lands, and that to the extent the 1891 Statute purported to grant exclusive jurisdiction over such lands, it was not accepted. Over the Coso entities' objection, the trial court allowed these documents into evidence "on a very limited basis as being the documents [Frey] relied upon in support of his opinion."

[15] Although the trial court did not rely upon, or determine the merits of, Inyo's affirmative defenses, the Coso entities address the defenses "to ensure that this Court does not mistakenly rely on them as alternative grounds to affirm." Because we do not need to consider, and our decision does not depend upon, Inyo's defenses as a ground to affirm, we do not address the Coso entities' arguments.

## DISPOSITION

The judgment is affirmed. Inyo shall recover its costs.

Ward, Acting P. J., and Gaut, J., concurred.