Filed 9/23/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| DEPARTMENT OF WATER RESOURCES CASES. | C092087 |
| | (Super. Ct. No. STK-CV-UED-2010-0006719) |
| | (JCCP No. 4594) |

APPEAL from a judgment of the Superior Court of San Joaquin County, John P. Farrell, Judge.  Affirmed.

Lisa A. Travis, County Counsel, William C. Burke, Deputy County Counsel for Plaintiff and Appellant County of Sacramento.

Rob Bonta, Attorney General, Danielle F. O'Bannon, Senior Assistant Attorney General, Bruce D. McGagin, Supervising Deputy Attorney General, Christine E. Garske, Deputy Attorney General for Defendant and Respondent Department of Water Resources.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Part III.

1

Plaintiff and appellant County of Sacramento (County) appeals from the trial court's grant of summary judgment in favor of defendant and respondent Department of Water Resources (DWR).

In 2019, the County filed a complaint for injunctive relief alleging that DWR failed to obtain county permits before conducting geotechnical exploration activities related to a state water infrastructure project in the Delta region of Sacramento County. The County noted that its ordinance required all persons, including the state, to obtain county permits before conducting activities including drilling exploratory holes and borings. The County contended that it adopted its ordinance pursuant to division 7, chapter 10 of the Water Code,[1] and the Legislature had expressly waived the state's sovereign immunity with respect to the chapter's provisions. (§§ 13050, subd. (c); 13755.)

DWR moved for summary judgment. It asserted that, as a state agency acting within its governmental capacity, it is immune from local regulations except where the Legislature expressly waived that immunity. DWR further contended that its activities did not fall within the scope of chapter 10, which is a limited statute governing "wells," "water wells," "cathodic protection wells," and "geothermal heat exchange wells" as those terms are defined in the chapter. (§§ 13710-13713.) The trial court granted the motion, concluding DWR's exploration activities did not fall within the scope of chapter 10, and the County was not authorized to expand its regulatory authority over the state beyond that which was expressly authorized by the Legislature.

---

[1] Further references to chapter 10 are to division 7, chapter 10 of the Water Code, and further undesignated statutory references are to the Water Code.

The County challenges the trial court's ruling.  It contends the scope of the Legislature's waiver of sovereign immunity extends beyond activities expressly defined in chapter 10 to include activities governed by an administrative bulletin establishing drilling and boring standards that the Legislature referenced in chapter 10.  (§ 13801, subd. (c).)  Alternatively, the County argues that various statements made by DWR created a triable issue of fact as to whether DWR's exploration activities fall within the scope of activities expressly defined by chapter 10.  Finally, the County challenges multiple evidentiary rulings made by the trial court.

In the published portion of our opinion, we conclude the scope of the Legislature's waiver of the state's immunity extended only to the activities expressly defined in chapter 10.  In the unpublished portion of our opinion, we agree with DWR that the County failed to establish a genuine dispute of material fact as to whether DWR's exploration activities fall within the scope of chapter 10 as we construe it, and also conclude that the County has failed to demonstrate prejudice from the trial court's evidentiary rulings, even if we were to assume error.  Accordingly, we affirm the judgment.

## FACTS AND PROCEEDINGS

The following facts are taken from the evidence set forth in the papers filed in connection with the summary judgment motion, except that to which objections were properly made and sustained.  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)  We summarize the evidence in the light most favorable to the County, the party opposing summary judgment, resolving any doubts concerning the evidence in its favor.  (*Ibid.*)  We also provide some relevant background facts from our Supreme Court's decision in *Property Reserve, Inc. v. Superior Court* (2016) 1 Cal.5th 151 (*Property Reserve*).

"In an effort to improve the reliability of the water supply system in California as well as to address environmental and ecological concerns, [DWR] undertook to investigate the feasibility of constructing a new tunnel or canal in the Sacramento-San

3

Joaquin Delta as a means of delivering fresh water from Northern California to Central and Southern California. As part of the preliminary steps in going forward with the project, [DWR] sought to conduct environmental and geological studies and testing on more than 150 privately owned parcels of land that the state, in the future, might seek to acquire for the project through negotiation or eminent domain." (*Property Reserve, supra*, 1 Cal.5th at pp. 165-166.) "The proposed new [water conveyance] facilities would become part of the Bay Delta Conservation Plan and are intended to improve the reliability of the water supply statewide as well as to restore the Delta ecosystem and native fish populations." (*Id.* at p. 168.)

"Because the alternative potential locations for the new facilities cross or lie beneath privately owned lands, [DWR] sought to enter the private properties in question to ascertain preliminary environmental and geological information about the properties." (*Property Reserve, supra*, 1 Cal.5th at p. 168.) "Between 2008 and 2009, [DWR] filed more than 150 separate petitions in superior court . . . seeking entry onto properties located in five separate counties—San Joaquin, Contra Costa, Solano, Yolo, and Sacramento. In June 2009, [DWR] filed a request to coordinate in a single proceeding the numerous entry petitions . . . , and in March 2010, the superior court granted the request, coordinating the petitions in a single proceeding before the San Joaquin County Superior Court." (*Id.* at pp. 168-169.) DWR filed a petition seeking to conduct " 'environmental activities' " and " 'geological activities' " with respect to 35 properties, including "drilling deep holes or borings to determine subsoil conditions." (*Id.* at p. 169.)

In 2010, DWR published a Mitigated Negative Declaration and Initial Study (IS/MND), describing DWR's plans to conduct further geotechnical information gathering.[2] The IS/MND stated that DWR's work "includes overwater and land

---

[2] The trial court sustained DWR's objections to the relevance of the substance of the IS/MND, although it permitted the existence of the document itself to be received into the

4

geotechnical borings, cone penetration tests (CPTs) and small test pits in order to investigate soils in the Sacramento-San Joaquin Delta between 2010 and 2012." It asserted the activities "would provide soils data and groundwater conditions," that the project "requires Delta soils and groundwater information," and that the project requires drilling boreholes and performing CPTs to measure "location of the groundwater table" and allow estimation of "groundwater conditions." The IS/MND also provided, "[t]emporary test wells may be installed at some sites to investigate soil permeability and to allow sampling of dissolved gases in the groundwater," "[s]ite investigation activities may consist of . . . temporary well installation," and "[s]elect geotechnical drill holes may be completed as groundwater monitoring wells."

*Property Reserve and Entry Order*

In 2011, the trial court held a hearing during which DWR employees explained the need for and scope of the geological activities. (*Property Reserve, supra*, 1 Cal.5th at p. 171.) After determining optimal drilling sites, DWR would conduct " 'cone penetrometer testing' " on each property, which "involves pushing into the ground a long rod that emits signals to determine the subsurface composition of the tested land." (*Ibid.*) On 28 of the 35 properties, DWR geologists indicated that they would also need to "drill additional, larger 'soil borings' or 'drill holes.' " (*Id.* at p. 172.)

The trial court denied DWR's petition as it related to its proposed geological activities, which denial was affirmed by a divided panel of this court but reversed by our Supreme Court in July 2016. (*Property Reserve, supra*, 1 Cal.5th at pp. 173, 213.)

---

record. The court also sustained in its entirety DWR's objection to a subsequent addendum to the IS/MND. As we later explain, these rulings were not an abuse of discretion. But we include some mention of the excluded contents, as do the parties in their briefing, as necessary to support our discussion of the material considered by the trial court and its subsequent rulings.

In June 2017, the trial court authorized DWR to enter certain properties in Sacramento County for the purpose of conducting "Geological and Drilling Activities" (entry order). The entry order stated that the court "has determined the nature and scope of the activities reasonably necessary to accomplish the purposes identified, taking due consideration of constitutional and statutory requirements. The court has provided suitable limitations to strike the best possible balance between the needs of [DWR] and the interests of the property owners." The court concluded DWR "may conduct the studies" as follows: "Geological activities . . . will include one or more of the following: borings with auger and/or mud rotary drill, soils sampling using a Standard Penetrometer test (SPT) barrel and Shelby tubes, Cone Penetrometer test[] (CPT), and geophysical borings and surveys to obtain, study and examine soil and groundwater samples and to determine groundwater depth." In June 2019, the County became aware that DWR intended to begin conducting geotechnical explorations on certain private properties located in the Delta portion of Sacramento County and issued a stop work order.

*Addendum*

In 2019, DWR published an addendum to the IS/MND, which noted that DWR had acquired access to additional properties and anticipated undertaking 19 land explorations, including boreholes and CPTs, of locations analyzed in the IS/MND. The addendum recognized the activities described in the IS/MND "included overwater and land geotechnical borings, cone penetration tests (CPT[s]), temporary test wells (i.e. piezometers), and small test pits to investigate soils in the Sacramento-San Joaquin Delta." The addendum recognized: "This testing is necessary to gather additional geotechnical data in the relevant areas for evaluation of the feasibility of water conveyance facility alternatives[,]" and was written to address geotechnical explorations on parcels where access was obtained via the entry order. According to the addendum, the work would include seven CPTs and 12 land geotechnical borings.

6

*County's Action for Injunctive Relief*

The County filed a complaint for damages and injunctive relief against DWR, alleging that DWR violated the County's well-drilling ordinance by failing to apply for or obtain required drilling permits from the County before DWR conducted exploratory geotechnical drilling, boring, and related activities. (Sac. County Code, § 6.28.030.)

The trial court denied the County's request for a temporary restraining order pending the outcome of its action and the County's ex parte application for an order barring DWR from drilling until the Court of Appeal authorized it to do so. We denied the County's writ of supersedeas requesting an injunction, stay, or other court order barring DWR from conducting its geological borings.[3]

The trial court later granted DWR's petition to add the County's action to the pending coordinated eminent domain proceedings in the San Joaquin Superior Court. The County of San Joaquin subsequently filed a lawsuit against DWR on similar grounds; that action was also added to the coordinated eminent domain proceedings.

*Summary Judgment*

The County and DWR filed cross-motions for summary judgment. DWR argued that its work is authorized by the trial court pursuant to the entry order, which allows for soil boring and CPT sites, and that it has complied with the entry order and the amendments thereto. It asserted the soil borings and CPT sites are for the sole purpose of testing soil conditions, and no water was or will be extracted or injected into any soil boring or CPT site. Accordingly, DWR contended its geotechnical explorations

---

[3] DWR requests that we take judicial notice of the County's Petition for Writ of Supersedeas with Request for Stay it filed in this court, DWR's opposition to the County's petition, and this court's order denying the County's petition. We grant DWR's request. (Evid. Code, § 452, subd. (d) [judicial notice may be taken of records of any court of this state].)

conducted pursuant to the entry order did not require it to obtain a County permit because they do not constitute a well or monitoring well as those terms are defined in chapter 10.

In support of its motion, DWR submitted a declaration of Allan T. Davis, a DWR supervising right of way agent. Davis declared: "The soil borings and CPT sites DWR are drilling pursuant to the entry order are for the sole purpose of testing the soil, not the ground water. [¶] . . . DWR will not be extracting any water from any soil boring or CPT site drilled pursuant to the entry order. [¶] . . . DWR will not be injecting any water into any soil boring or CPT site drilled pursuant to the entry order. [¶] . . . [¶] . . . The soil borings and CPT sites DWR has already completed in Sacramento County did not result in the extraction or injection of water into the underground." The trial court admitted Davis' declaration, and the County does not challenge its admissibility in this appeal.

In opposition to DWR's motion and in its own motion, the County contended statements in the IS/MND and addendum, to the extent those activities are authorized by the entry order, conflicted with Davis' declaration. The County also asserted that the Legislature incorporated the drilling standards established by DWR Bulletin No. 74-81, Water Well Standards: State of California (an administrative bulletin), by referring to the bulletin in section 13801, subdivision (c), which requires local authorities to enact ordinances meeting or exceeding the standards set forth in the bulletin. According to the County, the Legislature's incorporation of the bulletin by reference expanded the scope of chapter 10 to include "test holes" and "exploration holes," as those terms are defined by the bulletin.[4]

---

[4] In support of its opposition, the County submitted a declaration of Christopher Hunley, the county employee who issued the stop work order to DWR. DWR objected to the declaration, and the trial court sustained the objections as to the portions of the declaration relevant in this appeal. The County challenges the court's ruling as to two

DWR objected to the IS/MND and addendum on the basis that those documents are irrelevant. DWR asserted that the entry order is the "operative authorizing document," which allows only geotechnical borings and CPT. DWR relied on the Davis declaration, in which Davis confirmed that DWR's geotechnical activities pursuant to the entry order consist only of soil borings and CPT for the purpose of acquiring soil samples and stratification data. The trial court sustained DWR's objections to the statements contained in the IS/MND and addendum.

The trial court granted DWR's motion and denied the County's. The court concluded the entry order governs the actual geological activities on the parcels in question; while DWR may choose to do less than is authorized by the entry order, "it cannot do more than authorized by the [e]ntry [o]rder regardless of what may be in the IS/MND." The court recognized DWR attested that the drillings authorized by the entry order are not for the purpose of extracting water from, or injecting water into, the underground or for any of the other purposes listed in section 13710, and "there is no evidence to the contrary." The court concluded the IS/MND raises no triable material fact because there is no evidence DWR intended to exceed the provisions of the entry order and expressly attested it would not do so.

The judgment confirming the trial court's ruling was signed on May 6, 2020. DWR prepared and served notice of entry of judgment on July 13, 2020. The County filed its notice of appeal on May 18, 2020. The County's civil case information statement was rejected for failure to attach a copy of the judgment from which it was appealing, and the County amended its statement to cure the deficiency. The case was fully briefed on December 31, 2020 and argument was held at the parties' request on July 20, 2021.

_____

paragraphs of the declaration, which we discuss in the unpublished portion of our opinion, *post*.

9

## DISCUSSION

### I

### *Mootness*

DWR first asserts that the County's appeal is moot and should be dismissed because it completed its geotechnical drilling activities on the affected parcels, and the County's complaint alleged only a single cause of action for violation of its well-drilling ordinance, seeking temporary or preliminary injunctive relief. " 'An appeal should be dismissed as moot when the occurrence of events renders it impossible for the appellate court to grant appellant any effective relief.' [Citation.] There are three discretionary exceptions to the rules regarding mootness allowing a court to review the merits of an issue: '(1) when the case presents an issue of broad public interest that is likely to recur [citation]; (2) when there may be a recurrence of the controversy between the parties [citation]; and (3) when a material question remains for the court's determination.' " (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1547-1548.)

The County responds that there will be a recurrence of the controversy between the parties. Specifically, the County asserts that DWR is continuing to conduct exploratory drilling in Sacramento County related to the project. In support, the County filed a request for judicial notice that included a California Environmental Quality Act (CEQA) notice of preparation issued January 15, 2020, and a mitigated negative declaration adopted July 9, 2020, in which DWR detailed its plans to continue drilling as part of the project. We grant the County's request for judicial notice of these documents. (Evid. Code, § 452, subd. (c) [judicial notice may be taken of official acts of the executive departments of any state].)[5]

---

[5] The County also moves to admit new documentary evidence that it asserts is relevant to the issue of mootness. Given the delay in the County's request as well as the cumulative nature of the evidence the County seeks to admit, coupled with the County's lack of

10

The County further contends this case presents an issue of broad public interest that is likely to recur because the project affects no fewer than five counties, the state "will undoubtedly have reason to conduct drilling in the future," whether for the project or for some other State purpose, and the issue of groundwater quality is generally of broad public interest.

We agree with the County that the issue presented here is likely to recur both between these parties and between DWR and other counties. As DWR's environmental filings make clear, the water conveyance project has not been completed, and DWR has not completed its geotechnical explorations. Therefore, the issue of whether DWR must obtain county permits before conducting geotechnical explorations is likely to recur, either between DWR and the County or between DWR and other counties. Accordingly, we exercise our discretion to consider the County's claims on appeal.

II

*Sovereign Immunity*

The County next challenges the trial court's conclusion that DWR was not required to obtain county permits before conducting its geotechnical exploration activities on the affected parcels. The parties agree, and we agree with the parties, that the Legislature waived the state's immunity with respect to activities conducted within the scope of chapter 10.[6] (§§ 13755 ["Every person shall comply with this chapter and any

_____

analysis of its "exceptional circumstances" assertion, the motion to augment the record is denied.

[6] Generally, when the State of California engages in sovereign activities, "it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation." (*Hall v. City of Taft* (1956) 47 Cal.2d 177, 183.) " ' "Because the 'state's immunity from local regulations is merely an extension of the concept of sovereign immunity' [citation], the consent to waive the immunity must be stated in 'express words' [citation] in a statute [citation]." ' " (*Bame v. City of Del Mar* (2001) 86 Cal.App.4th 1346, 1356.) An example of such an express waiver is "a statute which provides that every 'person' must obtain a permit for coastal development from the

11

regulation adopted pursuant thereto, in addition to standards adopted by any city or county"; 13050, subd. (c) [" 'Person' includes any city, county, district, the state, and the United States, to the extent authorized by federal law"].)

The parties, however, disagree on the *scope* of that waiver. At the outset, we recognize that "[l]aws which tend to limit sovereignty are strictly construed in favor of the State." (*Greene v. Franchise Tax Bd.* (1972) 27 Cal.App.3d 38, 42; *Coso Energy Developers v. County of Inyo* (2004) 122 Cal.App.4th 1512, 1533.)

The County contends that the Legislature expressly waived DWR's immunity as to activities subject to Bulletin No. 74-81, a DWR administrative bulletin entitled "Water Well Standards: State of California," when it enacted a statute requiring "each county . . . [to] adopt a water well, cathodic protection well, and monitoring well drilling and abandonment ordinance that meets or exceeds the standards contained in Bulletin [No.] 74-81." (§ 13801, subd. (c).) DWR disagrees; it contends the Legislature's reference to Bulletin No. 74-81 does not affect the scope of the waiver of immunity, which extends only to those activities expressly defined in chapter 10. The trial court agreed with DWR and concluded that the provisions of Bulletin No. 74-81 did not expand the scope of the Legislature's express waiver of DWR's immunity beyond the scope of terms defined by chapter 10.

Accordingly, we analyze section 13801 to determine whether the Legislature expressly waived immunity as to activities described by Bulletin No. 74-81 but that are not within the scope of activities defined by chapter 10. Because "the issue presented involves the interpretation of a statute and the application of that statute to undisputed facts, it is subject to this court's independent or de novo review." (*City of Saratoga v. Hinz* (2004) 115 Cal.App.4th 1202, 1212.)

---

city and 'person' is defined to include the state government." (*Del Norte Disposal, Inc. v. Department of Corrections* (1994) 26 Cal.App.4th 1009, 1013.)

A. *Principles of Statutory Interpretation*

Our fundamental task in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.) The first step in the interpretative process is to examine the words of the statute, because "statutory language is generally the most reliable indicator of legislative intent." (*Ibid.*) We give the words of a statute their ordinary and usual meaning and construe them in the context of the statute as a whole. (*Ibid.*) "Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage." (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22.)

"Ordinarily, if the statutory language is clear and unambiguous, there is no need for judicial construction. [Citation.] Nonetheless, a court may determine whether the literal meaning of a statute comports with its purpose. [Citation.] We need not follow the plain meaning of a statute when to do so would 'frustrate[ ] the manifest purposes of the legislation as a whole or [lead] to absurd results.' " (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340.)

When the plain meaning of the statutory language is insufficient to resolve the question of interpretation, we proceed to the second step of statutory construction. In this step, "we may consider various extrinsic aids to help us ascertain the lawmakers' intent, including legislative history, public policy, settled rules of statutory construction, and an examination of the evils to be remedied and the legislative scheme encompassing the statute in question." (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 928.) "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.) "Finally, the court may consider the impact of an interpretation on public policy, for '[w]here

13

uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.' " (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663.)

B. *Chapter 10*

Chapter 10 is limited in scope. Its preamble sets forth its areas of concern: "The Legislature finds that the greater portion of the water used in this state is obtained from underground sources and that those waters are subject to impairment in quality and purity, causing detriment to the health, safety and welfare of the people of the state. The Legislature therefore declares that the people of the state have a primary interest in the location, construction, maintenance, abandonment, and destruction of *water wells, cathodic protection wells, groundwater monitoring wells, and geothermal heat exchange wells*, which activities directly affect the quality and purity of underground waters." (§ 13700, italics added.) The Legislature further found that "[i]mproperly constructed and abandoned *water wells, cathodic protection wells, groundwater monitoring wells, and geothermal heat exchange wells*" can both "allow contaminated water on the surface to flow down the well casing, thereby contaminating the usable groundwater" and "allow unstable or low quality groundwater from one groundwater level to flow along the well casing to usable groundwater levels, thereby contaminating the usable groundwater." (§ 13701, subds. (a) & (b), italics added.)

Consistent with these findings, chapter 10 defines "well" and "water well," "cathodic protection well," "monitoring well," and "geothermal heat exchange well." (§§ 13710-13713.)[7] As used in chapter 10, " '[w]ell' or 'water well' " is defined in part as "any artificial excavation constructed by any method for the purpose of extracting

---

[7] The only other term expressly defined by chapter 10 establishes an exemption to the reporting requirements of the chapter, referring to "wells constructed for the purpose of monitoring groundwater which has adversely affected, or threatens to adversely affect, crop root zones." (§ 13712.5.)

14

water from, or injecting water into, the underground" (§ 13710), and "[m]onitoring well" is defined as "any artificial excavation by any method for the purpose of monitoring fluctuations in groundwater levels, quality of underground waters, or the concentration of contaminants in underground waters" (§ 13712).

Chapter 10's provisions reiterate the narrow scope of the chapter. For example, section 13750.5 establishes that any person who "undertake[s] to dig, bore, or drill a water well, cathodic protection well, groundwater monitoring well, or geothermal heat exchange well, to deepen or reperforate such a well, or to abandon or destroy such a well," must possess a specified contractor's license. Similarly, section 13751 requires "[e]very person who digs, bores, or drills a water well, cathodic protection well, groundwater monitoring well, or geothermal heat exchange well, abandons or destroys such a well, or deepens or reperforates such a well" to file a report of completion.

C. *Bulletins No. 74-81 and 74-90 and County Ordinances*

Despite the limited scope of chapter 10, the County contends that the Legislature expressly waived DWR's immunity with respect to activities described in Bulletin No. 74-81 when it amended section 13801 to add subdivisions (b) through (e) in 1986. (Stats. 1986, ch. 1152, § 4; § 13801 was further amended in 1991 and 2010, but those amendments did not materially affect subd. (c).) Bulletin No. 74-81 specifies that its reporting and well destruction standards apply to "exploration holes" or "test holes," which are found within the bulletin's definition of "[t]est [w]ells": "[w]ells constructed for the purpose of obtaining the information needed to design a well prior to its construction. Such wells are not to be confused with 'test holes' or 'exploration holes' which are temporary in nature (i.e., uncased excavations whose purpose is the immediate determination of existing geologic and hydrologic conditions)."

Pursuant to the requirements in section 13801, subdivision (c), the County adopted a well protection ordinance. (Sac. County Code, ch. 6.28.) The ordinance requires, *inter alia*, the state to apply for and receive a permit before digging, boring, drilling,

15

deepening, modifying, repairing, inactivating, or destroying a well, which is defined to include exploratory borings.  (*Id.*, ch. 6.28.030, subd. (A), ch.6.28.010, subd. (O).)

In 1991, DWR published Bulletin No. 74-90 as a supplement to Bulletin No. 74-81.  Bulletin No. 74-90 clarifies that the two bulletins together contain the "minimum requirements for construction, alteration, maintenance, and destruction of water wells, monitoring wells, and cathodic protection wells in California."  It asserts it was developed "to respond to [DWR] responsibilities under the Water Code, and to keep pace with technical advances during the ten-year period following publication of Bulletin [No.] 74-81."  Bulletin No. 74-90 excluded the definition for "test holes" and revised the definition of "[e]xploration [h]ole" to not include excavations for the purpose of determining existing geologic conditions.

D. *Analysis*

The County contends the Legislature was aware of the existence of Bulletin No. 74-81 when it enacted section 13801, and therefore it intended to expand the waiver of DWR's immunity to include "test holes" and "exploration holes" as those terms are defined by and subject to the standards set forth in the bulletin.  In support of its argument, the County cites without discussion or analysis *Deborah M. v. Superior Court* (2005) 128 Cal.App.4th 1181 (*Deborah M.*).  That case, however, is distinguishable.  At issue in *Deborah M.* was whether Family Code section 3041.5, subdivision (a) permitted drug testing by means of a hair follicle test.  The statute provided:  "If substance abuse testing is ordered by the court, the testing shall be performed in conformance with procedures and standards established by the United States Department of Health and Human Services for drug testing of federal employees."  (*Deborah M.*, at p. 1190, quoting Fam. Code, § 3041.5, subd. (a).)  Because the statute expressly stated that the testing shall be performed in accordance with federal procedures and standards, the court concluded that the statute incorporated those procedures and standards, and a test would only be permissible if it were included in the federal standards or allowed by the federal

16

government.  (*Deborah M.*, at pp. 1190-1192.)  The court observed that the Legislature was aware of the federal guidelines at the time it enacted the statute, and it did not specify the types of tests that could be conducted because the federal guidelines *did*.  (*Id.* at pp. 1192-1193.)

The statute here is generally similar to the one at issue in *Deborah M.* in that both statutes refer to an external set of standards.  However, the statutes are materially distinguishable in their directive and scope as they relate to the Legislature's waiver of DWR's immunity.  In *Deborah M.,* the Legislature declined to identify allowable drug tests and instead incorporated federal standards and procedures as the state law standards and procedures.  Here, conversely, the Legislature did *not* incorporate the bulletin's definitions to establish the scope of chapter 10.  Rather, chapter 10 expressly provides definitions "as used in this chapter," and there is no suggestion in chapter 10 that definitions in the bulletin supersede those in sections 13710 through 13713.  (See *Greene v. Franchise Tax Bd., supra*, 27 Cal.App.3d at p. 42 ["Laws which tend to limit sovereignty are strictly construed in favor of the State"]; *Coso Energy Developers v. County of Inyo, supra*, 122 Cal.App.4th at p. 1533 [same].)

Additionally, where the statute in *Deborah M.* incorporated federal standards and procedures, here section 13801, subdivision (c) does not suggest that the scope of chapter 10 is affected in any way by Bulletin No. 74-81.  Rather, section 13801, subdivision (c) requires *local authorities* to adopt a "water well, cathodic protection well, and monitoring well" ordinance meeting or exceeding the standards set forth in Bulletin No. 74-81.  Although the local ordinance must meet or exceed the bulletin's standards, the statute does not suggest that the scope of chapter 10--and the Legislature's waiver of DWR's immunity--is broader than those activities defined by chapter 10.

The County contends that enforcing its ordinance only to the extent that it addresses "water wells" and "monitoring wells" as defined in chapter 10 "would be to read the Legislature's mandate for local agencies to enforce the Bulletin [No.] 74-81

17

standards out of [s]ection 13801," would nullify that part of the statute, and would conflict with the court's duty to give meaning to all provisions of a statute. We disagree. Section 13801, subdivision (c) continues to require local authorities to adopt ordinances meeting or exceeding the standards in Bulletin No. 74-81. That is not the issue before us. The issue before us is the extent to which the Legislature, by its express words, waived DWR's immunity. We conclude that the Legislature waived DWR's immunity only with respect to the activities defined in sections 13710 to 13713.

Our conclusion is supported by *California Groundwater Association v. Semitropic Water Storage District* (2009) 178 Cal.App.4th 1460 (*California Groundwater*), which concluded that the Legislature did not adopt Bulletin No. 74-81 as state law. (*Id.* at p. 1469.) There, the plaintiff water well drilling association challenged the trial court's conclusion that section 13750.5 does not apply to public entities such as the defendant water district. Section 13750.5 requires in part that a person who "undertake[s] to dig, bore, or drill a water well, cathodic protection well, groundwater monitoring well, or geothermal heat exchange well" must possess a "C-57 Water Well Contractor's License." The appellate court held that the water district was not exempt from the licensing requirement expressly set forth in section 13750.5 despite a C-57 licensing exemption for public entities in the Contractors' State License Law; the court observed that the licensing requirement was set forth by section 13750.5 and the Water Code contained no exceptions from its requirements. (*California Groundwater*, at pp. 1465-1466.)

The court in *California Groundwater* also considered whether section 13801 "effectively incorporates" into state law the licensing exemptions contained in Bulletin No. 74-81. (*California Groundwater, supra*, 178 Cal.App.4th at pp. 1468-1469.) Section 13801, subdivision (b) requires the State Water Resources Control Board to "adopt a model water well, cathodic protection well, and monitoring well drilling and abandonment ordinance implementing the standards for water well construction, maintenance, and abandonment contained in [Bulletin No. 74-81]." Bulletin No. 74-81

18

required that contractors must be licensed in accordance with the provisions of the licensing law unless exempted by that act, and the water district contended the Legislature incorporated those exemptions into the Water Code.  (*California Groundwater*, at pp. 1468-1469.)

The court rejected the water district's argument, concluding in part that the Legislature did not adopt Bulletin No. 74-81 as state law.  (*California Groundwater, supra*, 178 Cal.App.4th at p. 1469.)  The court observed that section 13801, subdivision (b) directed the state to adopt a model ordinance, which local authorities were to consider before adopting an ordinance that "meets or exceeds" the standards set forth in the bulletin (§ 13801, subd. (c)), and therefore "the bulletin standards were intended to provide a flexible baseline for local ordinances."  (*California Groundwater*, at p. 1469.)  The court expressed doubt that Bulletin No. 74-81 had been incorporated into state law because DWR had supplemented its requirements with additional provisions in Bulletin No. 74-90.  (*Ibid.*)  Had Bulletin No. 74-81 been enacted as statutory law, the court observed, DWR "would have lacked legislative authorization to amend the bulletin."  (*Ibid.*)

The County attempts to distinguish *California Groundwater* on the basis that the defendant in that case advocated for the court to accept as law a provision in Bulletin No. 74-81 that directly conflicted with the clear licensing requirement in chapter 10, which did not mention C-57 licensing exemptions.  Here, the County argues, the Legislature expressly required that enforcing agencies adopt and enforce the drilling standards set forth in Bulletin No. 74-81.  But the court in *California Groundwater* did not conclude that Bulletin No. 74-81 was not enacted as state law because the provision in the bulletin conflicted with a statutory requirement.  Rather, as we have discussed, that court held Bulletin No. 74-81 was not enacted as state law because section 13801, subdivision (b) required only that DWR adopt a model ordinance implementing the standards in the bulletin for consideration by local authorities, which the local authority

19

was required to "meet or exceed." (*California Groundwater, supra*, 178 Cal.App.4th at p. 1469.) Similarly, here, section 13801, subdivision (c) directs local authorities to adopt ordinances meeting or exceeding the standards contained in Bulletin No. 74-81, but does not expand the scope of chapter 10.

The County also argues that DWR's authority to supplement the bulletin does not affect whether Bulletin No. 74-81 was enacted as statutory law because Bulletin No. 74-90 has not been referenced by statute. The County does not explain this argument, but it appears to contend that Bulletin No. 74-81 was incorporated into state law by section 13801 while Bulletin No. 74-90 is without legal effect because it was not. However, the County does not assert that DWR is prohibited from amending or supplementing its bulletins, and we have no reason to believe it is. Accordingly, we share the doubt voiced by the *California Groundwater* court that Bulletin No. 74-81 *was* enacted into state law, while subsequent authorized amendments and supplements to the bulletin were *not*.

Based on the foregoing, the trial court correctly concluded that DWR is immune from the County's ordinance.[8]

### III

*Summary Judgment and the Trial Court's Evidentiary Rulings*

The County challenges the trial court's decision to grant DWR's motion for summary judgment, arguing that DWR's statements in the IS/MND and addendum, to the

---

[8] Because we hold the plain language of the statute demonstrates its meaning, we do not consider the parties' arguments regarding the legislative history of chapter 10. Additionally, because we review the trial court's decision de novo, we do not consider the County's arguments regarding the trial court's reasoning. Finally, because we conclude the Legislature's reference to Bulletin No. 74-81 did not expand the scope of the Legislature's waiver of DWR's immunity, we conclude the trial court did not abuse its discretion by sustaining DWR's objection to the introduction of the bulletins at summary judgment because those documents are not relevant to establish the scope of the Legislature's waiver of immunity.

20

extent those documents describe activities authorized by the entry order, create a triable issue of fact as to whether DWR's geotechnical explorations on the affected parcels involved constructing "wells" or "monitoring wells" as those terms are defined in chapter 10. Because the trial court sustained DWR's objections to the relevance of these documents and excluded their contents from consideration, the County also challenges these evidentiary rulings.

A. *Standard of Review*

On a motion for summary judgment, a defendant must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) Summary judgment is appropriate only "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Id.*, subd. (c).) A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

"Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc, supra*, 36 Cal.4th at p. 1037.)

"In performing an independent review of the granting of summary judgment, we conduct the same procedure employed by the trial court. We examine (1) the pleadings to determine the elements of the claim, (2) the motion to determine if it establishes facts

21

justifying judgment in the moving party's favor, and (3) the opposition—assuming movant has met its initial burden—to 'decide whether the opposing party has demonstrated the existence of a triable, material fact issue. [Citation.]' [Citations.] We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630.)

Furthermore, our review is governed by a fundamental principle of appellate procedure, namely, that " '[a] judgment or order of the lower court is *presumed correct*,' " and thus, " 'error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Under this principle, plaintiff bears the burden of establishing error on appeal, even though defendants had the burden of proving their right to summary judgment before the trial court. (*Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 474.) For this reason, our review is limited to contentions adequately raised and supported in plaintiff's brief. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125-126.)

We review the trial court's evidentiary rulings on a summary judgment motion for an abuse of discretion. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852; *DiCola v. White Brothers Performance Products, Inc*. (2008) 158 Cal.App.4th 666, 679.)[9]

---

[9] We recognize that in *Reid v. Google, Inc*. (2010) 50 Cal.4th 512, 535, our Supreme Court declined to decide "generally whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo." (See also *Nazir v. United Airlines, Inc*. (2009) 178 Cal.App.4th 243, 255, fn. 4 [observing that the standard of review is unsettled and assuming, without deciding, that the abuse of discretion standard applies].) But the weight of authority--both before and after *Reid*--holds that an appellate court applies an abuse of discretion standard when reviewing a trial court's ruling on evidentiary objections made in connection with a summary judgment motion. (See *Serri v. Santa Clara University, supra*, 226 Cal.App.4th at p. 852 ["According to the weight of

22

B. *Procedural Background*

At summary judgment, DWR objected to the IS/MND and addendum on the bases that those documents were not relevant to prove or disprove any issue of fact in the County's action and were misleading. DWR asserted that the entry order was the operative authorizing document, that order only authorized it to conduct geotechnical borings and CPTs, and DWR confirmed through the Davis declaration that it was conducting activities pursuant to the entry order only for the purposes of acquiring soil samples and stratification data. Accordingly, DWR asserted that any statements it made in the IS/MND and addendum did not create a triable issue of fact as to whether DWR was conducting any drilling activities within the scope of chapter 10.

The County responded that the IS/MND is DWR's official environmental record of the project plans and tended to prove what DWR's drilling work will entail. The County contended, as it does on appeal, that the IS/MND and addendum are relevant to the extent they describe activities authorized by the entry order, which allows DWR to "obtain, study, and examine soil and groundwater samples." The County further asserts that the IS/MND and addendum remain relevant despite the Davis declaration because that declaration conflicts with DWR's official CEQA documents and the entry order.

The trial court sustained DWR's objection to the addendum, and it sustained DWR's objection to the IS/MND as to the substance of that document. In its decision granting DWR's motion for summary judgment, the trial court concluded: "The drillings authorized by the Court's [e]ntry [o]rder in this case are not for the purpose of extracting water from, or injecting water into, the underground or for any of the other purposes listed in [s]ection[ ] 13710," recognizing that "DWR has attested so, and there is no evidence to the contrary."

---

authority, appellate courts 'review the trial court's evidentiary rulings on summary judgment for abuse of discretion' "].)

23

C. *Analysis*

On appeal, the County only asserts that the environmental documents are relevant, not that the trial court abused its discretion by sustaining DWR's objection. " ' "Arguments should be tailored according to the applicable standard of appellate review." [Citation.] Failure to acknowledge the proper scope of review is a concession of a lack of merit.' " (*Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948; see *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.)

We conclude the trial court's decision to sustain DWR's objections to the IS/MND and addendum were not an abuse of the court's discretion. The court correctly observed that the entry order governs the geological activities that may occur on the affected parcels, and it correctly recognized that DWR may do less, but not more, than what is authorized by the order, regardless of what is in the IS/MND or addendum. The entry order authorized DWR to conduct "one or more" of the following activities on the affected parcels in Sacramento County: "borings with auger and/or mud rotary drill, soils sampling using a Standard Penetrometer test (SPT) barrel and Shelby tubes, Cone Penetrometer testing (CPT), and geophysical borings and surveys to obtain, study and examine soil and groundwater samples and to determine groundwater depth. The geological activities are necessary to identify the suitability of the geological conditions of each property being studied for various alternative alignment locations for a Delta water conveyance project, including surface canal and underground pipeline alternatives."

Contrary to the County's contention, the Davis declaration does not contradict the IS/MND, addendum, or entry order. Although the entry order authorizes DWR to "obtain . . . groundwater samples" that would necessitate construction of a "water well" as defined in chapter 10 (§ 13710), as we have recognized, DWR was entitled to do less than what is authorized by the order. Additionally, while the County refers to general

24

DWR objectives and requirements stated in the IS/MND and addendum, the County failed to provide any evidence to contradict DWR's express statement that it did not and will not conduct activities within the scope of chapter 10 on the affected parcels. The County has not pointed to any evidence suggesting that DWR obtained groundwater samples on the affected parcels, or that its CPT borings fall within the definition of a "water well" or "monitoring well" in chapter 10. Similarly, while the County points to various statements about what *might* be necessary to complete the project, it points to no statements of DWR's intent with respect to the affected parcels that contradicts Davis' declaration.

The County recognizes that there is no evidence that DWR actually conducted activities constituting a "well" or a "monitoring well" under chapter 10, but it argues it would be impossible for it to present evidence that DWR was conducting or intended to conduct activities on the affected parcels that would require a county permit. DWR, however, *did* present evidence establishing that the contrary is true: that DWR did not and would not conduct activities on the affected parcels within the scope of chapter 10. Nothing in the IS/MND or addendum casts doubt on the Davis declaration, and the trial court properly sustained DWR's objections to that evidence.

Because there is no triable issue of fact as to whether DWR's geotechnical exploration activities were within the scope of chapter 10, the trial court did not err in granting DWR's motion for summary judgment.

D. *Other Evidentiary Rulings*

The County challenges other evidentiary rulings made by the trial court, including sustaining DWR's objections to excerpts from comments to the draft and final environmental impact report (DEIR and FEIR, respectively) and a comment letter, and paragraphs 4 and 12 of Hunley's declaration. Even if we assume error, the County has failed to demonstrate prejudice therefrom.

25

The County challenges the trial court's ruling sustaining DWR's objections to the DEIR on the basis that the DEIR demonstrates DWR was aware of and considered the applicability of local ordinances. Similarly, the County challenges the trial court's ruling regarding a County comment letter, which the County contends demonstrates that DWR considered the applicability of local ordinances and that the County had put DWR on notice of its position that its ordinance would apply to DWR. Finally, the County challenges the court's ruling regarding the FEIR on the basis that it demonstrates that DWR suggested it would apply for a county permit. According to the County, it introduced the documents "to show why [the County] did not file an action or intervene sooner," and they are relevant to show that DWR and the County had formal communications giving the County "some sense" that DWR would seek a county permit. The County recognizes that the documents "were not introduced for the purpose of insinuating that DWR had already made a commitment to applying for well permits."

We conclude these documents are not relevant to the issue presented here: whether DWR is required to request a permit from the County. Whether DWR considered the applicability of the County's ordinances before declining to apply for a permit is irrelevant.

The County next asserts the trial court improperly excluded paragraphs 4 and 12 of Hunley's declaration, in which Hunley described what he saw when issuing the work order. The County asserts that these paragraphs of the declaration prove that DWR was drilling in Sacramento County and that the drilling came within 10 feet of groundwater, which is part of the criteria for applicability of the County well ordinance. (Sac. County Code, ch. 6.28.010, subd. (O)(6).) But as we have concluded that DWR is immune from the County's ordinance, whether DWR's activities fall within the parameters of the ordinance is irrelevant. The trial court's decision to sustain DWR's objection to paragraphs 4 and 12 of Hunley's declaration did not prejudice the County.

26

The County alleges no improperly excluded evidence that gives rise to a genuine dispute of material fact as to whether DWR's geotechnical activities on the affected parcels constituted an activity within the scope of chapter 10. Accordingly, the trial court did not err by granting DWR's motion for summary judgment.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to DWR. (Cal. Rules of Court, rule 8.278(a).)

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Murray, Acting P. J.

_____/s/_____
Krause, J.