TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

|  | : |  |
|---|---|---|
| OPINION | : |  |
|  | : | No. 24-405 |
| of | : |  |
|  | : | May 15, 2025 |
| ROB BONTA | : |  |
| Attorney General | : |  |
|  | : |  |
| RYAN B. McCARROLL | : |  |
| Deputy Attorney General | : |  |

The HONORABLE JENNIFER LUCCHESI, EXECUTIVE OFFICER OF THE CALIFORNIA STATE LANDS COMMISSION, has requested an opinion regarding federal jurisdiction over San Clemente Island.

**QUESTION PRESENTED AND CONCLUSION**

Statutes 1897, chapter 56, extended to the federal government an offer of "exclusive jurisdiction over all lands within this State now held, occupied, or reserved by the Government of the United States for military purposes or defense, or which may hereafter be ceded or conveyed to said United States for such purposes." Did that offer apply to San Clemente Island off the coast of Southern California?

No. We remain of the view expressed in this office's Indexed Letter No. IL 74-15 (Jan. 23, 1974) that the offer of exclusive jurisdiction under Statutes 1897, chapter 56, did not include San Clemente Island. The historical record does not establish that the federal government used the island for military purposes in 1897. Nor was the island ceded or conveyed to the United States after 1897. But because there is no dispute that the island is federal property, our conclusion does not implicate the federal government's constitutional power to use the island for military purposes, as it has since 1934.

1

24-405

# BACKGROUND

The property clause of the United States Constitution gives Congress the power "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."[1] This means, among other things, that Congress has plenary authority to regulate the use of federal land.[2] But the property clause does not by itself prevent States from regulating individuals who choose to live, work, or recreate on federal land. Rather, the United States Supreme Court has held that individuals who are on federal land remain subject to and protected by state laws, so long as those laws do not impair the federal government's effective use of the land.[3]

In contrast, the enclave clause of the United States Constitution establishes certain places, described below, where Congress has the power to exercise "exclusive Legislation in all Cases whatsoever."[4] If a property qualifies as a "federal enclave," then "federal jurisdiction is exclusive of all state authority" within that property.[5] As such, the Constitution generally bars the State "from exercising any legislative authority including its taxing and police powers in relation to the property and activities of individuals and corporations" that are located in federal enclaves.[6]

The only places mentioned in the enclave clause are the District of Columbia and locations that the federal government has "purchased by the [c]onsent" of the home State for certain purposes.[7] But nothing forbids a State from agreeing to the creation of a

---

[1] U.S. Const., art. IV, § 3, cl. 2.

[2] *Kleppe v. New Mexico* (1976) 426 U.S. 529, 536, 543; see *United States v. City and County of San Francisco* (1940) 310 U.S. 16, 29-30.

[3] *California Coastal Com'n v. Granite Rock Co.* (1987) 480 U.S. 572, 580; *Kleppe v. New Mexico*, *supra*, 426 U.S. at p. 543; *Surplus Trading Co. v. Cook* (1930) 281 U.S. 647, 651; see *Ft. Leavenworth R. Co. v. Lowe* (1885) 114 U.S. 525, 531, 539; accord, *People v. Rinehart* (2016) 1 Cal.5th 652, 660, 663.

[4] U.S. Const., art. I, § 8; see generally *Ft. Leavenworth R. Co. v. Lowe*, *supra*, 114 U.S. at pp. 528-530.

[5] *Ft. Leavenworth R. Co. v. Lowe*, *supra*, 114 U.S. at p. 532.

[6] *Coso Energy Developers v. County of Inyo* (2004) 122 Cal.App.4th 1512, 1519 (*Coso Energy Developers*), quoting *Silas Mason Co. v. Tax Comm. of Washington* (1937) 302 U.S. 186, 197; see *Paul v. United States* (1963) 371 U.S. 245, 263.

[7] U.S. Const., art. I, § 8 (referring to "the Seat of Government of the United States" and "all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings"); see *James v. Dravo Contracting Co.* (1937) 302 U.S. 134, 143 (reference to

(continued…)

2

24-405

federal enclave without regard to how or when the United States acquired the land.[8]  Nor does the Constitution forbid a State from attaching whatever terms, conditions, and power-sharing arrangements are acceptable to Congress.[9]  In other words, state and federal officials "may make mutually satisfactory arrangements as to jurisdiction of territory within their borders and thus in a most effective way, cooperatively adjust problems flowing from our dual system of government."[10]

Consistent with these general principles, the California Legislature has a long history of allowing Congress to exercise exclusive legislative jurisdiction over certain places located in our State.[11]  But a 1958 study by Attorney General Edmund G. Brown described certain "inconsistencies, vagaries, and redundancies" in the relevant statutes.[12]  The study attributed some of the "great difficulty in interpreting these statutes" to the different ways in which they described the places at issue.[13]  For example, instead of identifying discrete plots of land, some early statutes gave Congress exclusive jurisdiction over any land that the United States had acquired for specified purposes or by specified methods.[14]

At issue here is the language that the Legislature used in Statutes 1897, chapter 56. As originally enacted, the statute provided with immediate effect:

> The State of California hereby cedes to the United States of America exclusive jurisdiction over all lands within this State now held, occupied, or reserved by the Government of the United States for military purposes or defense, or which may hereafter be ceded or conveyed to said United States

needful buildings includes "whatever structures are found to be necessary in the performance of the functions of the federal government").

[8] *Ft. Leavenworth R. Co. v. Lowe*, *supra*, 114 U.S. at pp. 541-542; see *Coso Energy Developers*, *supra*, 122 Cal.App.4th at pp. 1520-1521.

[9] *James v. Dravo Contracting Co.*, *supra*, 302 U.S. at pp. 147-149; *Ft. Leavenworth R. Co. v. Lowe*, *supra*, 114 U.S. at p. 539.

[10] *Collins v. Yosemite Park & Curry Co.* (1938) 304 U.S. 518, 528.

[11] See *Paul v. United States*, *supra*, 371 U.S. at p. 265; Interdepartmental Com. for the Study of Jur. Over Federal Areas Within the States, Report, Pt. 1, Facts and Com. Recommendations (Apr. 1956) pp. 131-135.

[12] Cal. Dept. of Justice, Jur. Over Federal Enclaves in Cal. (1958) p. 3.

[13] *Id*. at pp. 2, 8-9, 71-73.

[14] *Id*. at pp. 3, D1; see, e.g., Stats. 1852, ch. 76, p. 149 (referring to any land that the United States had purchased for the purpose of erecting public buildings or establishments); Stats. 1891, ch. 181, p. 262 (referring to any land that had been ceded or conveyed to the United States).

for such purposes; *provided*, that a sufficient description by metes and bounds and a map or plat of such lands be filed in the proper office of record in the county in which the same are situated . . . .[15]

The Legislature repealed the statute in 1943 and replaced it with a codified version that similarly referred to "lands within the State held, occupied, or reserved on March 2, 1897 by the United States for military purposes or defense" and "land which thereafter has been or which may be ceded or conveyed to the United States for such purposes."[16]

In 1973, the California Department of Fish and Game asked Attorney General Evelle J. Younger whether the federal government was correct in asserting exclusive jurisdiction over San Clemente Island and its surrounding waters pursuant to the 1897 statute.[17]  Attorney General Younger responded by issuing Indexed Letter No. IL 74-15, which summarized the relevant history of the island as follows, with bracketed citations that did not appear in the original Indexed Letter added:

> [The island] has been owned by the United States continuously since the effective date of the Treaty of Guadalupe Hidalgo in 1848.[18]  By executive orders issued in 1854 and 1867, the island was reserved for lighthouse purposes.[19] . . .  In 1934, control and jurisdiction of the island were transferred from the United States Commerce Department to the United

---

[15] Stats. 1897, ch. 56, § 1, pp. 51-52, original italics.

[16] Former Gov. Code, § 114, enacted by Stats. 1943, ch. 134, pp. 898-899, repealed by Stats. 1947, ch. 1532, § 3, p. 3164; see Stats. 1943, ch. 134, p. 1009 (repealing Stats. 1897, ch. 56).

[17] See Indexed Letter No. IL 74-15 (Jan. 23, 1974) pp. 1-2.

[18] See *United States v. California* (1978) 436 U.S. 32, 34, fn. 3; accord, *Thompson v. Doaksum* (1886) 68 Cal. 593, 596.

[19] See Exec. Order (Sept. 11, 1854), available in ProQuest Congressional Database, Executive Orders and Presidential Proclamations, No. 1854-41-3 (reserving "a sufficient quantity of land for the site of the Light House and the accommodation of the keeper" at a "site to be selected" on "St. Clemente [Island]" and each of five other places in California); see also Exec. Order (Jan. 26, 1867) available in ProQuest Congressional Database, Executive Orders and Presidential Proclamations, No. 1867-41-6 (reserving 22 places for lighthouse purposes, numbers 15 and 16 of which were on San Clemente Island and already subject to the Executive Order of Sept. 11, 1854).

4

States Navy Department.[20]  Since that time, we assume, the entire island has been reserved and used continuously for naval and defense purposes.[21]

The Indexed Letter also observed that the Navy had filed "an assertedly sufficient metes and bounds description and map of the island in 1935."[22]  Indeed, a 1935 cover letter indicated that the Navy had filed those documents with the Los Angeles County Recorder so that the federal government would obtain exclusive jurisdiction over the island and its surroundings pursuant to the 1897 statute.[23]

But the Indexed Letter concluded that the 1897 statute did *not* give the federal government exclusive jurisdiction over San Clemente Island.  In particular, the letter concluded that the island was not among the places that the Legislature had described in that statute:

> [Because] the island was reserved for lighthouse purposes, it was not in 1897 "now held, occupied, or reserved by the Government of the United States for military purposes or defense," in the words of California Statutes of 1897, Chapter 56.  Nor was it thereafter "ceded or conveyed to said United States for such purposes."  The words "ceded or conveyed" refer to a cession or conveyance by the State of California to the United States.  None occurred.  What happened was a transfer of jurisdiction from one

---

[20] See Exec. Order No. 6897 (Nov. 7, 1934) available at Franklin D. Roosevelt Presidential Museum and Library, www.fdrlibrary.marist.edu/_resources/images/eo/eo0024.pdf at pp. 63-64 (ordering that San Clemente Island be "transferred from the control and jurisdiction of the Secretary of Commerce to the control and jurisdiction of the Secretary of the Navy for naval purposes; there being reserved, however, for the use of the Department of Commerce sites to be selected by that Department on which to erect and maintain such aids to navigation and incidental facilities as the Secretary of Commerce may consider desirable").

[21] See United States Navy Installations Command, Naval Auxiliary Landing Field San Clemente Island, https://cnrsw.cnic.navy.mil/Installations/NAVBASE-Coronado/About/Installations/Naval-Auxiliary-Landing-Field-San-Clemente-Island (as of May 15, 2025).

[22] Indexed Letter, No. IL 74-15, *supra*, at pp. 1-2; see Letter and Enclosures from Rear Admiral William Tarrant to Los Angeles County Recorder (April 9, 1935) (recording Exec. Order No. 6897 along with a map of San Clemente Island and its surroundings); see also Letter and Enclosure from Rear Admiral Sinclair Gannon to Los Angeles County Recorder (Mar. 11, 1938) (recording corrections contained in Exec. Order No. 7805 (Feb. 5, 1938)).

[23] Letter from Rear Admiral Tarrant, *supra*.

5

federal department to another, without any activity on the part of the State of California.[24]

As such, the letter concluded that the 1897 statute "did not transfer to the United States exclusive jurisdiction of the island nor was such exclusive jurisdiction acquired later by a cession or conveyance by the State of California."[25]

Although the Indexed Letter concluded that the federal government did not have exclusive jurisdiction over San Clemente Island, it did not cast any doubt on the Navy's ability to continue using the island for military purposes. In particular, the letter did not question the Navy's ability to use the island "to support tactical training of the Pacific Fleet" and "as a key research and development facility."[26] Nor did the letter dissuade the Navy from expanding its operations on the island in the years after Attorney General Younger issued the letter, including during the Global War on Terror.[27]

The California State Lands Commission now requests a formal opinion "clarifying or confirming the prior advice" contained in the Indexed Letter.[28] The Commission is responsible for, among other things, maintaining an index of the places over which the federal government has "acquired jurisdiction pursuant to . . . state law. Said index shall record the degree of jurisdiction obtained by the United States for each acquisition."[29]

## ANALYSIS

We agree with Indexed Letter No. IL 74-15 that Statutes 1897, chapter 56, did not offer the federal government exclusive jurisdiction over San Clemente Island. The historical record does not establish that the United States held, occupied, or reserved the island "for military purposes or defense" when the statute took effect in 1897. Nor was the island subsequently "ceded or conveyed to said United States" at any time while the statute was in effect. Like the Indexed Letter, our conclusion here does not affect the federal government's ability to continue using the island for military purposes.

---

[24] Indexed Letter No. IL 74-15, *supra*, at p. 4.

[25] *Ibid*.

[26] United States Navy Installations Command, *supra*.

[27] See *ibid*. (reporting the construction of new facilities along with a 25 percent increase in training on San Clemente Island after the terrorist attacks of September 11, 2001).

[28] Exec. Officer Jennifer Lucchesi, Cal. State Lands Com., letter to Sr. Asst. Atty. Gen. Marc Nolan (Apr. 18, 2024) p. 1.

[29] Gov. Code, § 127.

6

**Summary of Relevant Legal Standards**

Whether the 1897 statute offered the federal government exclusive jurisdiction over San Clemente Island involves a mixed question of law and fact. The first step in our analysis is to determine the meaning of the statute, with particular focus on the categories of land described therein. The second step is to apply that meaning to the historical facts regarding the land at issue here.

To determine the meaning of a statute, we apply the settled rules of statutory interpretation.[30] But unique considerations apply when the statute gives the federal government the opportunity to exercise jurisdiction that would otherwise belong to the State. The California Supreme Court has observed that, "since self-preservation is the first law of nations and states, as well as of individuals, it will not be presumed, in the absence of clearly expressed intent, that the state has relinquished its sovereignty."[31] Similarly, the Court of Appeal has explained that "statutes restricting or derogating the state's sovereignty should be strictly construed in favor of the state."[32] And statutory ambiguity "weighs heavily against [an assertion of exclusive federal jurisdiction]."[33]

As for the factual component of the question presented, our analysis is necessarily limited. Our charge under Government Code section 12519 is to answer questions of law, not to investigate or adjudicate disputes over historical facts.[34] But the historical facts here consist of official actions that were recorded in public records. Although those records are somewhat obscure, there does not appear to be a material dispute regarding their substance or significance. We may therefore apply the law to the historical facts to determine how the 1897 statute applies.

**San Clemente Island Was Not "Now" Held, Occupied, or Reserved "For Military Purposes or Defense" on March 2, 1897**

We begin by considering whether San Clemente Island was "*now* held, occupied, or reserved by the Government of the United States for military purposes or defense" within the meaning of Statutes 1897, chapter 56.[35] As mentioned above, Indexed Letter

---

[30] See *Coso Energy Developers*, *supra*, 122 Cal.App.4th at p. 1524.

[31] *Standard Oil Co. of California v. Johnson* (1938) 10 Cal.2d 758, 766-767, quoting *Ryan v. State* (1936) 188 Wash. 115, 130; see *People v. Rinehart*, *supra*, 1 Cal.5th at p. 660 ("Dual sovereignty is the rule, federal exclusivity the exception").

[32] *Coso Energy Developers*, *supra*, 122 Cal.App.4th at p. 1533.

[33] *Ibid*.

[34] See 106 Ops.Cal.Atty.Gen 119, 124, fn. 41 (2023); 105 Ops.Cal.Atty.Gen. 39, 39 (2022).

[35] Stats. 1897, ch. 56, § 1, pp. 51-52, italics added.

7

No. IL 74-15 focused in this regard on the status of the island when the statute first took effect in 1897, not on the status of the island after it was transferred to the Navy in 1934. And because the island had been reserved for lighthouses purposes in 1897, the letter concluded that it had not been reserved for military purposes or defense at that time.

It is our understanding that some staff members at the State Lands Commission have taken a different view of the 1897 statute.[36] They have posited that the statutory reference to land "now" held, occupied, or reserved by the Government of the United States for military purposes or defense referred to the status of the land *at any point in time*.[37] And because the statute was still in effect when the federal government reserved San Clemente Island for military purposes in 1934, those staff members have indicated that the island was included in the statute's offer of exclusive jurisdiction.[38]

But, in our view, Indexed Letter No. IL 74-15 was correct when it interpreted the offer as applying only to land that was held, occupied, or reserved by the federal government for military purposes or defense on the date that the statute first took effect in 1897. That interpretation was consistent with the plain meaning of the statutory reference to land "now" held, occupied, or reserved by the federal government, especially when considered alongside the reference to land that may "hereafter" be ceded or conveyed to the United States. And its limiting interpretation of the word "now" avoided a potential redundancy in the statute, as we are not aware of how land could be ceded or conveyed to the United States for military purposes or defense without the land being held, occupied, or reserved by the federal government at some point in time.[39] That interpretation was also consistent with the codified version of the statute, which explicitly referred to land that was held, occupied, or reserved by the federal government on March 2, 1897.[40] Finally, as mentioned above, controlling precedent requires us to resolve differing interpretations of the statute in favor of the State retaining its jurisdiction to the fullest extent possible.[41] As such, we remain convinced that the question of whether land was

---

[36] See generally Cal. State Lands Com. Staff Atty. Andrew Kershen, Mem. to Chief Counsel Seth Blackmon (Apr. 10, 2024) attached to letter from Exec. Officer Lucchesi, *supra*.

[37] See *id*. at p. 7.

[38] See *id*. at p. 1.

[39] Cf. *Bernard v. Foley* (2006) 39 Cal.4th 794, 811 (an interpretation "that renders some statutory language surplusage or redundant is to be avoided").

[40] Former Gov. Code, § 114; Stats. 1943, ch. 134, p. 898.

[41] *Standard Oil Co. of California v. Johnson*, *supra*, 10 Cal.2d at pp. 766-767; *Coso Energy Developers*, *supra*, 122 Cal.App.4th at p. 1533.

24-405

"now" held, occupied, or reserved by the federal government for military purposes or defense turns on the status of that land in 1897.

Next, we consider the requirement that the land was "held, occupied, or reserved" by the federal government in 1897.[42]  The Court of Appeal has described this language as including any land that the United States owned in 1897 "regardless of how the United States came to own it," provided that it was recorded with the county.[43]  Consistent with that understating, Government Code section 126 explains that land is "held" by the federal government whenever it is "owned" by the United States.[44]  Here, the historical record indicates that the United States has owned San Clemente Island since 1848.[45]  As a result, we have no doubt that the island was "held, occupied, or reserved" by the federal government in 1897.

The question remains whether, in 1897, the federal government held, occupied, or reserved the island "for military purposes or defense."  The meaning of that phrase was at issue in *People v. Mouse*, in which the California Supreme Court held that the 1897 statute gave the federal government exclusive jurisdiction over crimes committed at the National Home for Disabled Volunteer Soldiers.[46]  The Court explained that "the nature of the institution, the purpose for which and the manner in which it is maintained, and the mode in which it is governed leaves no doubt that its use is exclusively for military purposes."[47]  In particular, the institution was established "for the care and relief of the disabled volunteers of the United States army," and its residents were "subject to" and "governed by" the "rules and articles of war . . . in the same manner as if they were in the army."[48]  Moreover, courts had already recognized that the National Home for Disabled Volunteer Soldiers was a necessary and proper exercise of the federal government's war powers.  "The power to declare war, and to raise and support armies, carries with it the incidental power to establish [facilities] for diseased and wounded soldiers."[49]  Indeed, "to leave [members of the armed forces] maimed and disabled while in the service of the

---

[42] Stats. 1897, ch. 56, § 1, pp. 51-52.

[43] *Coso Energy Developers*, *supra*, 122 Cal.App.4th at p. 1530.

[44] Gov. Code, § 126, subd. (a)(1)(B)(iii) ("[L]ands held by the United States are defined as . . . lands owned by the United States, including, but not limited to, public domain lands that are held for a public purpose").

[45] See notes 18 & 19, *ante*.

[46] *People v. Mouse* (1928) 203 Cal. 782, 786.

[47] *Ibid*.

[48] *Id*. at pp. 783-784, quoting *Sinks v. Reese* (1869) 19 Ohio St. 379, 313-314.

[49] *In re O'Connor* (1875) 37 Wis. 379, 388.

9

government, unprovided for, would shock not only the sensibilities, but the sense of justice, of all civilized [people]."[50]

In our view, the status of San Clemente Island in 1897 did not satisfy the standard suggested in *People v. Mouse*. As mentioned, the United States Navy did not have authority over the island until 1934.[51] Before then, the island was reserved at the recommendation of officials in the Treasury Department for the construction and operation of a lighthouse.[52] The ordinary purpose of a lighthouse is to provide an aid to navigation, which is typically available to all ships at sea—not just those in the Navy. We have found nothing to indicate that the officials who recommended a lighthouse on San Clemente Island intended for it to serve a military purpose. Nor have we found anything to suggest that the island and its surrounding waters were home to significant military activity when the 1897 statute took effect, much less when the lighthouse reservation was first established 43 years earlier.[53]

Our conclusion in this regard is consistent with the constitutional and administrative history of federal lighthouse operations. In 1789, proponents of a federal lighthouse system relied primarily on the power of Congress to regulate interstate commerce—not on its power to establish and maintain the military.[54] By 1860, President James Buchanan regarded "the authority to erect light-houses under the commercial power" to be "settled after an uninterrupted exercise of the power for seventy years."[55] And in 1896, President Grover Cleveland made federal lighthouse employees part of the

---

[50] *Sinks v. Reese*, *supra*, 19 Ohio St. at p. 315.

[51] Exec. Order No. 6897, *supra*.

[52] Exec. Order (Sept. 11, 1854), *supra*; see also Exec. Order (Jan. 26, 1867), *supra*.

[53] See generally Harrell, *San Diego, Guardian of the American Pacific* (2013) 95 So. Cal. Q. 47.

[54] See Grace, *From the Lighthouses: How the First Federal Internal Improvement Projects Created Precedent That Broadened the Commerce Clause, Shrunk the Takings Clause, and Affected Early Nineteenth Century Constitutional Debate* (2004) 68 Alb. L. Rev. 97, 101, 117-127; Currie, *The Constitution in Congress: Substantive Issues in the First Congress, 1789-1791* (1994) 61 U. Chi. L. Rev. 775, 798, 810; see also Letter from Pres. Thomas Jefferson to Treas. Sec. Albert Gallatin (Oct. 13, 1802) available at Library of Congress, www.loc.gov/resource/mtj1.027_0205_0205 (discussing the precedent that had been set by treating "the first act for building a light house" as "a regulation of commerce").

[55] Pres. Veto Message to United States Senate (Feb. 1, 1860) available at The American Presidency Project, www.presidency.ucsb.edu/documents/veto-message-451; see, e.g., Act of Sept. 28, 1850, ch. 77, §§ 3, 4; 9 Stat. 500 (lighthouse surveys in California and other states should consider "the interests of commerce").

24-405

civil service, unlike members of the armed forces.[56]  Indeed, lighthouse operations were part of the Treasury Department until 1903, and then part of the Commerce Department until 1939.[57]  Even today, the United States Coast Guard may establish, maintain, and operate lighthouses and other navigational aids to serve the needs of commerce in addition to those of the military.[58]

We do not mean to suggest that the statutory reference to "military purposes or defense" excluded all lighthouse operations on a categorical basis.  When Congress first authorized the construction of federal lighthouses and other navigational aids, "one might conceivably have argued that they were necessary and proper to provide and maintain a (future) navy."[59]  And, shortly after President Franklin Pierce reserved San Clemente Island for lighthouse purposes in 1854, he observed that navigational aids were consistent with "the power of Congress to maintain a navy and provide for the general defense."[60]  But as President Pierce also recognized in the same message to Congress, the "number" of navigational aids, "and in many instances their location, preclude the idea of their being fully justified as necessary and proper incidents of that power."[61]

As such, evidence that a particular plot of land was reserved for lighthouse purposes does not resolve the question of whether it was reserved for "military purposes or defense" within the meaning of Statutes 1897, chapter 56.  We cannot preclude the possibility that a particular lighthouse might have served military or defense purposes in 1897, as might have been the case if the lighthouse was near a Navy shipyard.  But we are not aware of any evidence that would suggest such a purpose with respect to the lighthouse reservation at issue here.  We must therefore conclude that the existence of a lighthouse reservation on San Clemente Island was insufficient by itself to prove that the island was "now held, occupied, or reserved by the Government of the United States for

---

[56] Exec. Order (May 6, 1896) available at The American Presidency Project, www.presidency.ucsb.edu/documents/executive-order-civil-service-rules.

[57] See United States Department of Commerce, Lighting America's Beacons, www.library.doc.gov/digital-exhibits/lighting-americas-beacons (as of May 15, 2025).

[58] 14 U.S.C. § 541(a)(1); see also Pub.L. No. 105-383, tit. II, § 208 (Nov. 13, 1998), 112 Stat. 3416 (contemplating "use of the aids to navigation system by commercial interests, members of the general public for personal recreation, Federal and State government for public safety, defense, and other similar purposes").

[59] Currie, *The Constitution in Congress: Substantive Issues in the First Congress, 1789-1791*, *supra*, 61 U. Chi. L. Rev. at p. 797.

[60] Pres. Message to Cong. (Dec. 30, 1854) available at The American Presidency Project, www.presidency.ucsb.edu/documents/veto-message-447 (elaborating on earlier veto message of Aug. 4, 1854).

[61] *Ibid*.

11

military purposes or defense" within the meaning of the 1897 statute and *People v. Mouse*.

**San Clemente Was Not "Hereafter Ceded or Conveyed to [the] United States"**

As mentioned above, the 1897 statute offered the federal government exclusive jurisdiction over a second category of land consisting of places "which may hereafter be ceded or conveyed to said United States for such purposes [i.e. military purposes or defense]."[62] The reference to land that was "hereafter" ceded or conveyed to the United States necessarily referred to events that occurred after the statute took effect in 1897. And it appears that the only relevant event affecting San Clemente Island during that time was the Executive Order that transferred control of the island from the Secretary of Commerce to the Secretary of the Navy in 1934.[63] As such, our focus is on whether that particular transfer "ceded or conveyed" the island "to [the] United States" within the meaning of the 1897 statute.

In our view, the plain meaning of the statutory text excluded interdepartmental transfers within the federal government like the one at issue here. The Court of Appeal has explained that "the words 'cede' and 'cession' generally refer to transfers of land or jurisdiction between two sovereigns or governments."[64] Indeed, the verb "cede" means "to yield or grant typically by treaty."[65] And, in this context, to "convey" means "to transfer or deliver (something, such as property) to another."[66] The statutory reference to land that was ceded or conveyed "to" the United States reinforces the conclusion that the United States must have received its claim to the land from a source that was outside of the federal government. Likewise, the 1897 statute referred to the "Government of the United States" and to "said United States" as a whole rather than to the military as a separate and distinct entity.[67] As such, land that was already owned by the United States could not have been "ceded or conveyed to" the United States by way of an interdepartmental transfer of authority within the federal government. For that reason alone, the 1934 transfer did not bring San Clemente Island within the scope of the 1897 statute.

Indexed Letter No. IL 74-15 also suggested that the reference to land that was ceded or conveyed to the United States applied only to land that was ceded or conveyed

---

[62] Stats. 1897, ch. 56, § 1, pp. 51-52.

[63] See Exec. Order No. 6897, *supra*.

[64] *Coso Energy Developers*, *supra*, 122 Cal.App.4th at p. 1534.

[65] Merriam-Webster's Dictionary, www.m-w.com/dictionary/cede (as of May 15, 2025).

[66] Merriam-Webster's Dictionary, www.m-w.com/dictionary/convey (as of May 15, 2025).

[67] Stats. 1897, ch. 56, § 1, pp. 51-52.

24-405

"by the State of California."[68]   The Court of Appeal subsequently reached the same conclusion in *Coso Energy Developers* regarding the meaning of Statutes 1891, chapter 181.  That statute provided in pertinent part:

> The State of California hereby cedes to the United States of America exclusive jurisdiction over such piece or parcel of land as may have been or may be hereafter *ceded or conveyed to the United States*, during the time the United States shall be or remain the owner thereof . . . .[69]

The plaintiffs in that case, who operated within the China Lake Naval Weapons Center, argued that the 1891 statute applied to land that the federal government had acquired from any source, including Mexico.[70]   The county, along with the State Lands Commission as amicus curiae, countered that the statute applied only to land that the federal government had acquired from the State of California.[71]

The Court of Appeal agreed with the county, holding that "the land description clause is . . . more reasonably read as referring to land ceded or conveyed *by the State of California* rather than *by all who cede or convey land to the United States*."[72]   It explained that, because the first clause of the statute "specified the State of California as the actor ceding jurisdiction . . . , the drafters would likely have viewed restating the name of the actor as to the transfer of land in the next clause of the sentence as unnecessarily repetitive."[73]   And, as a practical matter, it would have been "irrational" for the Legislature to entrust "virtually anyone who owns or acquires California land" with "the power to abrogate California's jurisdiction" over that land simply by ceding or conveying it to the United States "without any further action, approval, or even knowledge of the transfer, by the State of California."[74]   Moreover, limiting the 1891 statute to land that was ceded or conveyed by the State would avoid rendering subsequent grants of exclusive jurisdiction "unnecessary and superfluous."[75]

In our view, *Coso Energy Developers* controls the meaning of the 1897 statute at issue here.  It is "an established rule of statutory construction" that "when statutes are *in*

---

[68] Indexed Letter No. IL 74-15, *supra*, at p. 4.

[69] *Coso Energy Developers*, *supra*, 122 Cal.App.4th at p. 1523, quoting Stats. 1891, ch. 181, § 1, p. 262, italics added.

[70] *Id*. at p. 1523.

[71] *Id*. at p. 1518 & fn. 2.

[72] *Id*. at p. 1525, original italics.

[73] *Ibid*.

[74] *Id*. at pp. 1526-1527; see *id*. at p. 1535.

[75] *Id*. at pp. 1529-1530.

13

24-405

*pari materia* similar phrases appearing in each should be given like meanings."[76]  The 1891 and 1897 statutes were *in pari materia* because they had the same purpose of identifying places where the State was willing to grant exclusive jurisdiction to the federal government.[77]  And they shared identical language through which the State extended its offer with respect to land that might thereafter be "ceded or conveyed" to the United States.[78]  So the language in the 1897 statute should be given the same meaning as the language in the 1891 statute such that it covers only land that was ceded or conveyed by the State of California.

Applying that understanding of the statutory text, it is evident that San Clemente Island was never ceded or conveyed by the State of California.  Mexico ceded the island to the United States in 1848.[79]  When Congress admitted California into the Union two years later, it did not give the new state title to the island or any other federal lands.[80]  And there is no record of California acquiring title to the island at any time thereafter.  So, because the State never held title to the island, it would have been impossible for the State to cede or convey the island back to the federal government within the meaning of the 1897 statute.  We therefore remain of the view that, although the federal government owns the island and has used it for military purposes since 1934, its jurisdiction over the island is not exclusive under the 1897 statute.

**Other Considerations**

An analysis prepared by the staff of the State Lands Commission suggests that our interpretation of the 1897 statute might create "an undesirable or unintended gap in state policy."[81]  It posits in particular that our interpretation "could affected settled expectations" regarding the jurisdictional status of military facilities that were established after the 1897 statute took effect.[82]  But it does not identify a particular instance in which government officials or the general public might have detrimentally relied on a mistaken belief that the federal government had exclusive jurisdiction over San Clemente Island or another military facility.  And, in any event, our task here is only to discern the intent of the Legislature when it enacted the 1897 statute.  To the extent that reasonable minds

---

[76] *Ibid*., quoting *People v. Lamas* (2007) 42 Cal.4th 516, 525.

[77] See *People v. Tran* (2015) 61 Cal.4th 1160, 1168.

[78] See Stats. 1897, ch. 56, § 1, pp. 51-52; Stats. 1891, ch. 181, § 1, p. 262.

[79] See note 18, *ante*.

[80] See *ibid*.

[81] Mem. from Cal. State Lands Com. Staff Atty. Kershen, *supra*, at p. 7.

[82] *Ibid*.

14

may differ on that question, controlling precedent requires us to resolve that difference in favor of the State retaining its jurisdiction to the fullest extent possible.[83]

Finally, it bears repeating that the presence or absence of exclusive jurisdiction under the 1897 statute has nothing to do with the constitutional powers delegated to the federal government under the property clause.[84]  As such, our reaffirmance of the conclusion previously stated in Indexed Letter No. IL 74-15 does not implicate the power of Congress to reserve federal land for use by the armed forces.  And because there is no dispute that San Clemente Island has been reserved for use by the United States Navy since 1934, our conclusion does not affect the Navy's authority to continue using the island for military purposes.

---

[83] *Standard Oil Co. of California v. Johnson*, *supra*, 10 Cal.2d at pp. 766-767; *Coso Energy Developers*, *supra*, 122 Cal.App.4th at p. 1533.

[84] See *Kleppe v. New Mexico*, *supra*, 426 U.S. at pp. 542-543; see also *McCulloch v. Maryland* (1819) 17 U.S. 316, 436.